597 A.2d 1173

John A. ZITELLI, M.D.,

v.

DERMATOLOGY EDUCATION AND RESEARCH
FOUNDATION a Nonprofit Corporation, and

the University of Pittsburgh, a Non-
Profit Corporation, Appellant.

John A. ZITELLI, M.D.

v.

DERMATOLOGY EDUCATION AND RESEARCH FOUN-
DATION a Nonprofit Corporation and the University
of Pittsburgh a Nonprofit Corporation.

Appeal of DERMATOLOGY EDUCATION AND RESEARCH
FOUNDATION a Nonprofit Corporation.

Superior Court of Pennsylvania.

Argued May 24, 1991.

Filed Oct. 3, 1991.

Petition for Allowance of Appeal
Granted Jan. 13, 1992.

220

222

Jon G. Hogue, Pittsburgh, for appellant.

Henry E. Rea, Jr., Pittsburgh, for appellee.

Before TAMILIA, POPOVICH and MONTGOMERY, JJ.

TAMILIA, Judge:

This is an appeal from a final decree in equity, entered July 6, 1990, which adopted the July 6, 1990 adjudication and decree nisi entered by the Chancellor, thereby rejecting all claims for post-trial relief by appellants.

For purposes of this review, we adopt the Statement of Factual Background contained in the Adjudication of the trial court:

The instant equity action arises out of a dispute as to the ownership of a deferred compensation plan.

Plaintiff, John A. Zitelli, M.D., is a physician and surgeon who assumed a faculty position in the Department of Dermatology of the Medical School of the University of Pittsburgh. Due to the necessity of paying competitive salaries to attract the highest qualified physicians to the University of Pittsburgh School of Medicine, clinical practice plans were developed as a method to supplement physician member income.

The clinical practice plan in question here, the Dermatology Education and Research Foundation (DEAR) was incorporated as a non-profit corporation in 1981. The

initial board of directors of DEAR consisted of Dr. Zitelli, the Chairman of the Department of Dermatology, and the Dean of the School of Medicine.

Dr. Zitelli's case load and consequent generation of income increased rapidly to the extent that a deferred compensation agreement was discussed to supplement Dr. Zitelli's income in order to retain him as a member of the University School of Medical Faculty.

Contributions to a deferred compensation plan for Dr. Zitelli were made in 1982–83, 1983–84, 1984–85, and 1985–86. DEAR did not make a payment to Dr. Zitelli's deferred compensation account for the years 1986–1987 in the amount of Four Hundred and Ten Thousand Dollars ($410,000). Dr. Zitelli, however, believed that such payment had been approved and had been made.

Dr. Zitelli left the employment of DEAR in 1987. He is seeking to obtain his deferred compensation account, and the 1986–87 contribution which, he contends, should have been deposited in his deferred compensation account. He is also seeking severance pay which he claims was agreed upon by the board of directors of DEAR.

DEAR is defending Dr. Zitelli's claim on the basis that the amounts credited or paid into his deferred compensation account far exceed the University's guidelines for permissible payments to members of clinical practice plans. DEAR and the University claim that Dr. Zitelli abused his position as a member of DEAR in order to assure himself of these payments. DEAR claims the University guidelines prohibit a faculty member from receiving more than twice his base salary as a faculty member from practice plan income.

Further, DEAR, has raised several counterclaims against Dr. Zitelli, for removal of certain items of property and medical records alleged to be owned by DEAR, and self-dealing in an equipment lease with DEAR.

Adjudication & Decree Nisi, Musmanno, J., 7/6/90, pp. 1–3.

The appellants present a Statement of Questions Involved consisting of seven questions which are detailed as follows:

1. Whether an action which seeks only money damages is properly brought in equity thereby denying defendants a right to trial by jury?

2. Whether a cause of action in "equitable estoppel" exists?

3. Whether a plaintiff asserting equitable estoppel must prove its elements by clear, precise and convincing evidence?

4. Whether a plaintiff asserting equitable estoppel must prove that he justifiably relied upon the actions of those parties whom plaintiff seeks to estop?

5. Whether a director and officer who has not complied with the dictates of Pennsylvania Nonprofit Corporation Law and the corporation's own articles and by-laws nevertheless has a right to recover extraordinary bonus monies from the nonprofit corporation?

6. Whether a court sitting in equity must consider the affirmative defenses raised by the defendants in the adjudication of the action?

7. Whether two separate and distinct corporations can be proven to be alter egos of one another where no facts exist to make such a finding.

Appellants' brief, p. 2.

This action was pursued by Dr. Zitelli after he severed his employment relationship with both the University and DEAR (collectively "the appellants"), seeking specific performance, an accounting and finding existence of a constructive trust to recover from appellants monies he claims were owed him pursuant to a deferred compensation agreement. Appellants contested this claim for compensation arguing Zitelli had deliberately, secretly and wrongfully attempted to divert monies for his own benefit.

Before analyzing the questions presented, it is necessary for us to establish the standard of review which this Court must apply in determining the issues thereby presented.

In an equity case, the findings of the Chancellor will not be reversed unless it appears he has clearly abused

his discretion or committed an error of law. *Werner v. Werner*, 393 Pa.Super. 125, 573 A.2d 1119 (1990). The Chancellor's findings have the full force of a jury verdict and, if affirmed by the Court en banc, will not be disturbed on appeal. *Den–Tal–Ez, Inc. v. Siemens Capital Corp.*, 389 Pa.Super. 219, 566 A.2d 1214 (1989).

In the present case, Chancellor John L. Musmanno handed down 101 specific findings of facts and based 13 conclusions of law upon these findings of fact. For the reasons discussed below, we believe certain conclusions of law were erroneous as drawn from the findings of fact and, in one instance, the Chancellor ignored a properly pleaded defense, supported by the evidence, leading to an erroneous conclusion of law. That defense was the equitable doctrine of clean hands, or a variant thereof, to counter the claim of estoppel interposed against appellants' rights pursuant to the agreements entered into with Dr. Zitelli.

■ At the outset, we dispose of appellants' first issue by adopting appellee's contention this case was properly brought in equity for specific performance, an accounting and to declare a constructive trust rather than in assumpsit to provide a legal forum with a jury trial as requested by appellants. While conceivably an action in assumpsit would have presented a legal basis to test Dr. Zitelli's claim, the multifaceted relationships, practices and dealings in this case, which conceivably could have altered the contractual relationships, require the broader precepts applicable to equity actions to bring about a fair and just review and resolution of the matters.

In proceeding upon our analysis, we have divided our discussion into three categories to facilitate clarity of exposition and management of issues. In doing so, we will have disposed of the questions and arguments presented by both parties. The three sections are detailed under the following descriptive headings:

 I. Whether the University of Pittsburgh and DEAR are alter egos of each other, separate entities, or dominant/subsidiary systems subject to reciprocal

controls and restraints as detailed in the agreements governing their relationship.

II. Whether equitable estoppel may be relied upon in this case to establish appellee's right to the funds controlled by DEAR.

III. Whether a quasi-public relationship exists between the appellee and appellants, which requires the imposition of a public interest standard on behalf of the public and the community regardless of errors of omission and commission between the parties.

Appellee claims the funds in the hands of DEAR are subject to a constructive trust and, by virtue of actions or non-actions by various DEAR directors and University officials, appellants are estopped to deny the right of appellee to those funds. If estoppel applies, it does so only in the most limited sense and, at best, would entitle appellee to a quantum meruit share of those funds based on prior activity by properly authorized University committees and officials. A practice which provided for supplemental payments and bonuses cannot be extrapolated to cover a Deferred Compensation Plan not approved by the University and involving a windfall of funds never within the contemplation of any of the parties.

The Chancellor's findings on this issue are as follows.

1) The practice agreement was valid providing for $2 \times$ base compensation.

2) The deferred compensation agreement is dependent upon approval of each year and bonus by the University as well as the Board. There appears to have been approval of such bonuses through 1985. There is not approval of deferred compensation for 1986–1987.

3) The severance compensation agreement is not a document approved by the DEAR board or the University. No remuneration is permitted under the agreement.

The issues presented here may be resolved by answering the following questions:

1) Are the University and DEAR separate entities?

2) If they are separate entities, is the relationship such that DEAR may not act without approval of the University?

3) What are the limitations imposed upon the DEAR function by the University?

4) May DEAR act beyond the limitations imposed by the University if the University ratifies those acts?

5) May DEAR rely on equitable estoppel to obtain benefits of its actions not approved by the University when similar acts were ratified by the University?

6) May DEAR act to provide additions to its agreement without approval of a quorum of board members and only one disinterested member of the Board of Directors?

7) May DEAR, a charitable foundation, provide a deferred compensation program to one of its members, regardless of the income generated by that member, clearly excessive in relation to University guidelines, bonus arrangements and AAMC practice agreement standards?

8) By his actions, has appellee so manipulated the agreements and his position to generate income to achieve personal gain beyond the intent of the practice plan so as to place him in the position of breach of fiduciary duty and to render him violative of the doctrine of clean hands?

9) Have the University and the medical school, by their lack of oversight, created a vacuum in which interpretation of the agreement has become tentative and ambiguous, allowing some deviation from the letter of the agreements and articles of the Foundation?

10) Does any authority exist whereby equipment may be vested into a trust for appellants' children and then leased to DEAR without board or University approval because of possible conflict?

11) May an officer/director of a corporation/foundation who acts in violation of the bylaws and agreements claim estoppel when the University refuses to continue its ratification of the practice in preventing further breaches of the agreements?

12) Does lack of notice to other members of the board, when action in favor of an interested director takes place, invalidate such action or vitiate consent of noninvolved board members?

## I. *The Agreements*

In preparation for positing his findings of facts and conclusions of law, the Chancellor framed the issue in this case as follows.

> The primary issue in the instant case is the ownership of the funds contained in Dr. Zitelli's deferred compensation account. In order to resolve this issue, this Court [the trial court] must consider whether or not the contributions to Dr. Zitelli's deferred compensation plan exceeded University guidelines and, if so, did the University waive the application of its own guidelines. Lastly, this Court must also consider the issue of Dr. Zitelli's claim for severance pay upon leaving DEAR and the University.

Adjudication at 3–4.

■ In order for us to effectively determine the degree to which actions of various DEAR directors and University officials can work on estoppel, it is necessary to clarify the relationship between the two corporate entities and the meaning and effect of the various agreements which regulate their conduct. Estoppel applies when action, inaction or negligence by a party (University and DEAR) leads the other party (Zitelli) to act, thereby precluding the first parties from asserting a legal defense to the action by the second party. Crucial to this analysis is whether the agreements and understanding encompassed therein included the creation of a Deferred Compensation Plan, and, if not, whether the University and DEAR, by their actions, are

estopped from denying the validity of the plan. Incidental to this inquiry is whether certain actions of the University and DEAR constituted a waiver of their rights as opposed to an equitable estoppel.

Both DEAR and the University of Pittsburgh are corporations incorporated under the Nonprofit Corporation Laws of Pennsylvania (Adjudication at p. 4; Findings of Fact, pp. 2–3.) Beginning in 1940, to attract first rate full-time medical faculty members, the University adopted a salary policy which permitted medical faculty members to earn a higher salary in return for withdrawing from treatment of patients privately, except to the extent that it contributed to his or her academic requirements. Fees generated were paid directly to the University. In 1973, after adjustments to the policy appeared ineffective to produce a first rate faculty because of the rapid change in funding of medical care and the economics of managing medical education, the Executive Committee of the Faculty issued Faculty Salary Guidelines (Guidelines) which established the absolute limit of what a full-time faculty member could earn. The Guidelines permitted supplementation of physician faculty salaries with practice plan income in an amount not to exceed "an amount equal to base salary." Pursuant to the Guidelines, a physician could double his base salary with practice plan income. The Guidelines were incorporated into the agreement entered between each practice plan and the University (Adjudication at 7–10; Findings of Fact at 11–18). Dr. Zitelli entered into such a practice plan agreement in 1981 upon the incorporation of DEAR for that purpose. Article 5 of the agreement restricts compensation of employees of DEAR and subjects their compensation to the approval of the Dean and conformity with the Guidelines (Adjudication at 11–12; Findings of Fact at 25).

DEAR was incorporated exclusively for charitable purposes including, as its principle purpose, the providing of medical care, education and research in the speciality of dermatology to health care service providers described in Internal Revenue Code Section 501(c)(3), including primarily

the University of Pittsburgh School of Medicine and its affiliates and member organizations of the University Health Center of Pittsburgh (R. 1737a). The DEAR Articles of Incorporation also provided:

> [N]o part of the net earnings of the Corporation shall inure to the benefit of any private shareholder or individual, and no officer or employee of the Corporation shall receive any pecuniary benefits of any kind from the Corporation (except reasonable compensation for services effecting corporate purposes and reimbursement of payment of reasonable expenses incurred by them in the course of effecting such purpose).

*Id.* (R. 1738a; R. 1180a; R. 1267a.) As a result, DEAR received IRS 501(c)(3) tax exempt status and 509(a)(3) public foundation status which required it to use "all profit" for public charitable foundation purposes. (R. 2356a.) The Articles of Incorporation also provide "[t]he Corporation shall not engage in any act of self-dealing as defined in Section 4941(d) of the IRS Code of 1954." (R. 1738a.)

On November 19, 1981, the DEAR bylaws were adopted and the corporate officers were elected. The Board of Directors, under the DEAR bylaws, consisted of the Chairman of the Department of Dermatology, the Dean of the Medical School and one rotating director chosen among and by the members of DEAR. The original directors consisted of Dr. William H. Eaglestein, Chairman, Dr. Donald F. Leon, Dean, and Dr. Zitelli as rotating director, and Dr. Edward Abell, Secretary/Treasurer. Sections of the DEAR bylaws will be referred to as they become relevant.

When recruited by Dr. Eaglestein on July 1, 1980 to join the faculty of the newly created Department of Dermatology, Dr. Zitelli had completed training under a fellowship with Dr. Frederick E. Mohs for a surgical technique which treats skin cancer lesions by micrographic surgery which produces the highest cure rate of any skin cancer treatment. At the time he joined the University of Pittsburgh faculty, there were less than 50 members of the American College of Mohs Surgery and less than ten persons were

performing Mohs micrographic surgery in the United States (Adjudication at 5–6; Findings of Fact at 5–9).

When he was employed by the University, Dr. Zitelli's base salary was $37,500. When he terminated employment with the University, his base salary was $143,520. The base salary was supplemented in accordance with the University Guidelines and pursuant to the provisions of the DEAR practice plan as detailed in the following table:

| Year | Base | Supplement | Total Approved Compensation |
|------|------|------------|------------------------------|
| 1980–81 | $ 37,500 | $ 18,375 | $ 55,875 |
| 1981–82 | 60,000 | 36,000 | 96,000 |
| 1982–83 | 70,000 | 58,500 | 128,500 |
| 1983–84 | 102,500 | 102,400 | 205,000 |
| 1984–85 | 109,675 | 109,674 | 219,350 |
| 1985–86 | 114,062 | 114,062 | 228,124 |
| 1986–87 | 143,520 | 143,520 | 287,040 |

Thus his approved compensation went from $55,875 in 1980–81 to $287,040 in 1986–87. The rapid increase in income tracked Dr. Zitelli's value and contribution to the University and DEAR. Two summaries of his clinical activity and income therefrom illustrate what occurred during this period.

The number of Mohs surgery cases:
1980 – 116 cases
1981 – 481 cases
1982 – 545 cases
1983 – 687 cases
1984 – 803 cases
1985 – 1,066 cases
1986 – 1,259 cases
1987 – 1,647 cases

Income to DEAR resulting from the Mohs surgeries:
(a) Fiscal year ended June 30, 1983 $443,062.00
(b) Fiscal year end June 30, 1984 583,917.00
(c) Fiscal year end June 30, 1985 696,308.00

(d) Fiscal year ended June 30, 1986 1,159,688.76[1]
(e) Ten (10) months from July 1, 1986 to
 April 30, 1987 885,944.84

The above revenues were used to offset DEAR expenses with a significant excess of revenue remaining, when, in 1983, it became evident that Dr. Zitelli was the major contributor to DEAR. By virtue of his clinical practice, he discussed the possibility of instituting a Deferred Compensation Plan to permit him to obtain amounts greater than permitted under the Guidelines. Dr. Eaglestein approached Dr. Leon, Dean of the Medical School, and requested he be authorized to set up a Deferred Compensation Plan due to his extraordinary revenue. It is important to note that Dr. Zitelli's income, aside from bonuses or deferred compensation, was at or above the 85th percentile of salaries [2] reported in the AAMC guidelines (R. 1570a–1571a). To accomplish this, Jerome Cochran, Assistant Senior Vice Chancellor for Health Sciences, had advised Dr. Eaglestein that since any further compensation would exceed the $2\times$ base rule on compensation, any further compensation would have to be recommended by the Dean and approved by the Chancellor and Compensation Committee of the Board of Trustees (R. 1452a–1453a).

A Deferred Compensation Plan was prepared by Attorney Stephen Nash at Dr. Zitelli's request (Adjudication at 15; Findings of Fact at 36; T.T. 74–75, 307, 310). Subsequently, the plan was modified to eliminate a clause which required three years employment before deferred benefits would vest. The agreements, signed only by Dr. Eaglestein and Dr. Zitelli, as Director of DEAR, did not contain Dr. Leon's signature and never received approval by the DEAR Board of Directors nor were informal consents in writing for approval from the board received. The second agree-

---

1. The unusually large amount paid to DEAR in 1986 resulted from a recalculation of the amount Blue Shield would allow for the Mohs procedure, pro-rated over the surgeries prior to 1986.

2. By comparison, Dr. Thomas Starzl, who produced income in excess of $15,000,000 for the University, received $300,000, which was at or below the 85th percentile of salaries reported in the AAMC guidelines.

ment was dated June 30, 1983 and provided in paragraph one:

From time during the continuance of Zitelli's employment, but not less frequently than annually, the Board of Directors shall determine the amount, if any, which shall be credited as a deferred bonus for the benefit of Zitelli. Such deferred bonus amounts shall not be paid or made available to Zitelli but shall be credited to a deferred compensation account payable only as provided herein.

(R. 1951a). On July 8, 1983, Dr. Eaglestein contacted Dean Leon to request a deferred bonus arrangement for Dr. Zitelli (Finding of Fact at 37). Dean Leon, acting in his capacity as Dean of the Medical School, approved the concept of a deferred compensation arrangement and a salary increase for Dr. Zitelli with the understanding that additional income in the form of deferred bonuses would remain within the University Guidelines (R. 876a).[3]

Pursuant to this understanding, Dr. Leon approved for Dr. Zitelli a $30,000 bonus for fiscal year 1982–83, and a prospective bonus of $50,000 for fiscal year 1983–84 (Adjudication at 19; Findings of Fact at 53). The bonuses were recommended to the University Chancellor, who approved them and presented them to the Compensation Committee of the Board of Trustees where they were also approved (*Id.* at 54; Leon Deposition, 12/18/89, pp. 35–36, 68). However, formal approval by DEAR was neither sought nor obtained, and, as with the deferred compensation agreements, the only approval of the two bonuses was by signature of Drs. Eaglestein and Zitelli.

During subsequent years, deferred compensation payments were authorized by the same form agreement requiring only the signature of Dr. Zitelli and one other board member (Adjudication at 20; Findings of Fact at 58). Drs. Eaglestein and Zitelli negotiated at the end of each fiscal

3. Deferred compensation was maintained in other practice plans but only from the physicians approved supplement which did not place total salary above the $2\times$ base restriction (R. 1708a). It was established that in two plans this was ignored.

year an amount to be placed into Dr. Zitelli's deferred compensation account. Pursuant to this arrangement, the following amounts were credited to Dr. Zitelli's account:

| | |
|---|---|
| 1982–1983 | $ 30,000 |
| 1983–1984 | 50,000 |
| 1984–1985 | 80,000 |
| 1985–1986 | 650,000 |
| 1986–1987 | 410,000 |

(Adjudication at 21; Findings of Fact at 59.) The bonuses for 1984–85, 1985–86 and 1986–87 were never approved by the Dean, presented to the Chancellor or approved by the Compensation Committee of the University, Trustees or the DEAR Board. The 1984–85 bonus was signed by Drs. Eaglestein and Zitelli, the 1985–86 was signed by Dr. Eaglestein, *after* he left the position of Chairman of DEAR and the University of Pittsburgh on June 30, 1986, and the 1986–87 bonus was signed only by Dr. Zitelli and not approved by the then Dean of the medical department or any other member of the DEAR Board.

Subsequent to the 1983–84 approval by the Chancellor and Compensation Commission, no further approval was obtained although reports were submitted to various officials of DEAR and the University who were responsible for reviewing budgets, compensation and revenues. In March 1985, Dr. Zitelli had the deferred compensation account name changed to the Received Capital Account in time for submission of reports for the first time to Dr. Thomas Detre. When Dr. Eaglestein left the Medical School in 1986, Dr. Zitelli became Chairman of the Department of Dermatology and Dr. Abell became the physician member of the practice plan, with Dr. Detre, Dean, and Dr. Zitelli being the other two directors required by the bylaws.

In his brief, appellee maintains the Deferred Compensation Plan was approved by the University and the Dean of the Medical School. Appellants maintain it was not. The

Chancellor made no finding that a Deferred Compensation Plan was approved by the University but only that two compensation agreements ($30,000 in 1983–84, $50,000 in 1984–85) were approved by the University. The 1986 deferred compensation was not approved by the University, but only by Drs. Zitelli and Eaglestein, as Directors of DEAR, in the amount of $650,000. Dr. Eaglestein appears to have signed off after his resignation, back-dating the agreement to July 1985, and, therefore, his signature would appear to have no legality. (R. 1963a.) The 1986–87 agreement in the amount of $410,000, prepared for Dr. Zitelli's and Dr. Detre's signatures, was not approved by a majority of the board of directors as Dr. Abell and Dr. Detre refused to approve it. In fact, that agreement contains no signatures. (R. 2043a.)

In summation, the Chancellor found, and we agree, the University established guidelines and approved a practice plan whereby compensation was established for payment of Dr. Zitelli and other physicians in the plan. The Chancellor did not find that the University or DEAR approved a deferred compensation or severance plan for Dr. Zitelli. The Chancellor found that bonuses payable to the Deferred Compensation Plan were approved and, in principle, deferred compensation was appropriate. The Chancellor was silent on the right of Dr. Zitelli to establish a trust for his children and through the trust to purchase equipment and thereafter lease it to DEAR.

We agree with the findings of fact and conclusions of law propounded by the Chancellor as to the existence of the Guidelines, the validity of DEAR and the payment of $30,-000 and $50,000 into a deferred compensation account (which does not thereby establish a deferred compensation agreement). There is no authority in the Guidelines or the practice plan to go beyond the terms of those undertakings, and the validity of the two bonus payments lies with the approval of the bonuses by Dr. Leon *and* the University Chancellor and Compensation Committee of the Board of

Trustees rather than the existence of a deferred compensation agreement.

■ The procedure relied upon by Dr. Zitelli to convert approval to create a Deferred Compensation Plan to a de facto plan was legally insufficient. To begin with, the plan never received DEAR approval as required, it thereafter did not receive Dr. Leon's approval and, ultimately, it was not approved by and, therefore, not binding on the University. Subsequently, under cover of the alleged agreement, the bonuses beyond the initial two approved by the University were not approved by the requisite number of independent directors of DEAR, or by Dr. Leon or Dr. Detre, and ultimately not by the University Chancellor or the Compensation Committee of the Board of Trustees. In several respects, the Deferred Compensation Plan fails; first, because unless approved by DEAR and the University of Pittsburgh, compensation was limited by the Guidelines which permitted only an amount which complied with the 2x base formula. In all instances, the two approved by the University and the three not approved, the bonuses exceeded the $2\times$ base formula. While appellee relies on statements made by Dr. Leon that deferred compensation was a fringe benefit not included in the $2\times$ base formula, that Dr. Detre could not recall whether deferred compensation was within the Guidelines, and the statement of Jerome Cochran, Assistant Vice Chancellor for Health Services, that the Guidelines were inoperative between 1980 and 1986, their statements are not controlling. This latter contention is incompatible with the fact that the DEAR agreement specifically incorporated the Guidelines in 1981 and was complied with thereafter, exclusive of the deferred compensation bonuses. A review of the minutes of the meetings of DEAR establishes that physician compensation was a regular item on the agenda, but such is not the case with deferred compensation. The Chancellor's findings, with which we concur, establish the Guidelines were controlling and DEAR, as incorporated, was subject to the Guidelines pursuant to Article 5. Dr. Zitelli, as a director and incorpo-

rator, was fully aware of those conditions. We, therefore, hold the deferred compensation agreement was not implemented and, pursuant to the Guidelines and DEAR provisions, no amount of deferred compensation was authorized.

The relationship of DEAR to the University of Pittsburgh was one of a subordinate entity which could function only within the regulations established by the University as the governing body, and subject to approval on financial and compensation matters by the Budget Committee and the Compensation Committees established by the Board of Trustees. DEAR and its directors were not the alter-ego of the University and could not bind the University beyond the authority vested in them by the agreements with the University. DEAR could not act unilaterally to avoid the limitation imposed on its charter by the University as proscribed in the DEAR bylaws. While the Dean of Medical Services, Dr. Leon (later Dr. Detre), was the University representative on the DEAR Board of Directors, he could not, alone, act as the University and was subject to submission of compensation beyond the $2\times$ base formula to the Compensation Committee of the Board of Trustees and the Chancellor. DEAR could not, by action of its directors, even where properly constituted and approved (which was not the case here), implement exceptional compensation awards merely by approval of the Chairman of the Department of Dermatology (as director) and one other director, Dr. Zitelli, who, in those matters, was not a *neutral* director as required by the DEAR bylaws. The informality of DEAR operations was not a substitute for the required action by the board of directors in compensation matters. It is not possible to justify payments to the deferred compensation account of Dr. Zitelli by the legal structure which established Dr. Zitelli's employment and compensation with the University of Pittsburgh.

The Chancellor recognized in his findings of fact and conclusions of law the contractual relationship could not support Dr. Zitelli's position and he, therefore, adopted appellee's position of estoppel to deny that the Deferred

Compensation Plan, to some extent, was instituted through waiver by the University. It is in this respect we believe the Chancellor erred and that his conclusions of law, and to some degree his findings of fact, are not supported by the record.

## II. *Estoppel*

In this section we frame the issue to be analyzed and resolved as follows.

Whether equitable estoppel may be relied upon in this case to establish appellee's right to the funds controlled by DEAR.

It is appellee's contention and the finding by the Chancellor that the conduct of the University and DEAR, despite the Guidelines and agreement between Dr. Zitelli, DEAR and the University, was such as to constitute a waiver of University policy and DEAR proscriptions and the University and DEAR are estopped from precluding Dr. Zitelli from claiming the funds created in the deferred compensation account. Appellant vigorously protests this determination and maintains the Guidelines and DEAR agreement are controlling and appellee cannot claim a constructive trust of those funds was created because no legal basis exists for the Deferred Compensation Plan as its existence is due to appellee's manipulations and a total breach of his fiduciary duties as a director of DEAR. For the reasons discussed below, we believe the Chancellor committed an abuse of discretion in relying on the doctrine of equitable estoppel in finding for appellee and in ignoring, almost without exception, the voluminous record which establishes Dr. Zitelli had little or no authority for most of his actions and proceeded to implement the various plans (deferred compensation agreement, trust for his children and severance pay) without following appropriate procedures and with full knowledge of the limitations contained in the Guidelines and his and DEAR's agreement with the University. The thrust of appellee's position on equitable estoppel is that the failure of DEAR and the University to curtail his actions, despite the fact the University provided him with every benefit to

which he was entitled, cannot preclude him from claiming the additional funds. Appellee contends various financial reports submitted to the University and annual meetings with the Dean of the Medical School provided them with knowledge of the existence of the Deferred Compensation Plan. The appellants, on the other hand, maintain appellee cannot take the benefit of the deferred compensation agreement as it was not approved by the University or by the properly constituted Board of DEAR and his equitable claim is defeated by the doctrine of unclean hands. In effect, appellant maintains the actions of appellee were intra vires. *See* 18B Am.Jur.2d, Comment § 2012.[4]

Appellee relies on the practice of informality which developed under the DEAR plan and which was common with most of the 14 practice plans, as evidence of the binding effect of the agreements made by Dr. Zitelli with DEAR. In every instance, the agreements were signed only by Drs. Eaglestein and Zitelli or by Dr. Zitelli alone.

To support the estoppel claim, appellee produced evidence that numerous physicians had deferred compensation plans which exceeded the $2\times$ base guidelines and their compensation was allowed by the same informal process as Dr. Zitelli's. To this, appellants respond that most physicians were covered by the Guidelines and any deferred compensation came within the Guideline $2\times$ base rule. We believe appellee's reliance upon other plans and dealings within the plans and by the University with hundreds of doctors over almost 20 years is not controlling in this case as to the creation of waiver as estoppel. The case could be made out either way that the University policy and practice plan agreement were carefully monitored and enforced and, on the other hand, by reason of benign neglect, some plans provided physicians with deferred compensation beyond the

**4.** An intra vires problem arises if the board of directors takes action without obtaining necessary shareholder approval or if action is taken by officers without authorization of the board of directors. As to outsiders, such action could be held to be enforceable but as to benefits conferred on the interested board members may not be enforceable.

University Guidelines. To establish equitable estoppel in the face of convincing evidence of the existence of the Guideline policy and this practice plan agreement, appellee was required to show by clear and convincing evidence that the action or non-action by the University and DEAR precluded them from advancing the defense of the agreements. This, we believe, appellee has failed to do.[5]

We have clearly outlined the scope of the agreements and practice plan in part I and have concluded there is no legal basis under those agreements for appellee to recover. In only two instances was there a deviation from the agreement that has binding effect, but which flows from waiver and/or ratification and not estoppel.

Waiver, as contrasted to estoppel, is a voluntary and intentional abandonment or relinquishment of a known right, whereas estoppel may arise even though there was no intention on the party estopped to relinquish or change any existing right. 28 Am.Jur.2d, Estoppel and Waiver § 30. The action of the Dean of the Medical School, the Chancellor of the University and the Compensation Committee of the Board of Trustees in approving or ratifying the 1982–83 $30,000 bonus, and 1983–84 bonus of $50,000 constituted a waiver and/or ratification of those agreements between Dr. Zitelli and DEAR. They are not at issue in the estoppel analysis and do not establish the pattern upon which estoppel may be posited as they are qualitatively different.

In every other instance, estoppel is improperly applied because of the nature of the agreements creating DEAR, and between Dr. Zitelli and the appellants, the position of Dr. Zitelli as a director and the lack of actual knowledge as to the amounts proposed as deferred compensation conveyed to the financial officers of the University and the Dean of the Medical School. Because of the manner in

5. Additionally, testimony from University officials establishes there were numerous variants among the plans and how they were administered. It is, therefore, impossible to draw a conclusion or establish a finding upon which can be extrapolated a University custom or standard.

which Dr. Zitelli conducted himself, if an estoppel can be imputed against appellants, appellee can be denied the right to assert an estoppel by reason of certain facts which create an estoppel against himself.

> The doctrine applied in this situation is characterized as one of counterestoppel, or estoppel against estoppel. The effects of such doctrine are that two estoppels may destroy or neutralize each other, or, as otherwise expressed, one estoppel may set another at large, and that one party cannot rely on an estoppel *when he and he alone is responsible for facts which constitute the estoppel.*

28 Am.Jur.2d, Estoppel and Waiver § 116. Such is the situation here. The facts produced by the record establish that Dr. Zitelli initiated the entire operation creating a Deferred Compensation Plan in consultation with University-connected counsel and private counsel. The Deferred Compensation Plan was never formally adopted by DEAR and the various payments were not approved in the manner required by the laws of DEAR and the purported Deferred Compensation Plan.[6] The bylaws required that all corporate resolutions for deferred compensation be signed by three directors. In fact, only Drs. Eaglestein and Zitelli signed the forms. Dr. Leon, the other director, never signed the forms as required, and the form (as opposed to the bylaws) was later changed, requiring only two board signatures and a witness, so that Dr. Detre, in succeeding Dr. Leon, never was alerted to the $650,000 deferred compensation in 1985–86. It was only when Dr. Abell succeeded to the vacancy created by Dr. Eaglestein leaving in 1986, that it was learned by Dr. Detre such large amounts were being applied to the Deferred Compensation Plan. He

6. Our careful review of the voluminous record including agenda items and notes of various DEAR meetings over the years in question does not disclose any discussion relating to a Deferred Compensation Plan submitted to and approved by the DEAR Board. The agreements relating to the creation of the Deferred Compensation Plan and payments into the deferred compensation account were solely the product of Dr. Zitelli, counter-signed in most instances by Dr. Eaglestein with a secretarial staff person as witness.

alerted Dr. Detre, who immediately disapproved of any disbursement from that fund. Following this, an investigation disclosed the leasing-trust agreement for laser equipment, an automobile lease and a severance pay agreement. The severance agreement was signed by Dr. Eaglestein when Dr. Zitelli travelled to a Dermatology Society meeting in California to obtain the signature, after Dr. Eaglestein had resigned, was no longer director of dermatology and was on the faculty of Miami University Medical School. The severance pay agreement, unlike the deferred compensation agreement, was submitted to the DEAR Board but was specifically rejected by it. To further muddle the issue, it was at this time because of the implications the transfer of virtually all of the surplus earned by Dr. Zitelli from his clinical practice to his deferred compensation account might have on the status of nonprofit income tax status of DEAR under section 501(c) (also public foundation, under 26 U.S.C. § 509(a)(3)) of the Internal Revenue Code, the deferred compensation account was renamed to the "Research Capital Account" in 1985 before the end of the fiscal year.

While the first two bonuses were disclosed directly to the Dean and approved by the Chancellor and the Compensation Committee of the University Board of Trustees, the subsequent bonuses were known only to Dr. Zitelli and/or Dr. Eaglestein. It is clear throughout that Dr. Zitelli was the moving force behind creation of the Deferred Compensation Plan and subsequent fringe plans, and that Dr. Eaglestein "rubber stamped" any and all proposals. Dr. Eaglestein appeared totally concerned with retaining Dr. Zitelli in his department and exhibited no concern for living within the Guidelines on controlling the deferred compensation account. The extraordinary income generated by Dr. Zitelli was without question beneficial to the dermatology department and made Dr. Eaglestein's role much easier in maintaining financial stability in the department. Likewise, it appeared Dr. Leon was a low profile, passive participant in the plans established by the various departments involving large numbers of individual partici-

pants. The result with DEAR and some of the practice plans was to set their own course, ignoring University Guidelines and converting, in some instances, charitable foundations into entrepreneurial undertakings which channeled surplus income to individual physicians instead of enhancing and developing the department. It is conceivable that in some context this would be condoned and an estoppel applied. However, the facts that the Board of the DEAR foundation was not involved in approving these funds, Dr. Zitelli as one of three voting directors never acquired a majority of neutral directors in obtaining approval of the plans, the Dean of the Medical School did not participate or approve of them and the Chancellor and Board of Trustees did not approve them, leaves them without effective force. To rely on estoppel because two earlier bonuses had been ratified, when the ratification process was not pursued in the remainder, and when the actions of Dr. Zitelli throughout violated his duty as a director of DEAR in circumventing the requirements of the bylaws and the charitable purpose of the DEAR foundation, is unsupportable. The Chancellor erred in finding that the prior approval of the 1982–83 and 1983–84 bonuses estopped the University and DEAR from disclaiming the bonuses. The Chancellor also erred in finding that Dr. Zitelli was entitled to the huge bonuses because, as a condition of remaining with the Medical School, his income had to be competitive with practicing physicians in the field. The $1,000,000, plus excess, which Dr. Zitelli now claims, could not have been the inducement for his remaining with the University as those amounts were totally unanticipated and resulted from a recalculation of fees for the surgeries performed over several years, with the enhancement paid in a lump sum. We may speculate that if those increases had been part of the ongoing fee, Dr. Zitelli would have pushed for increased bonuses within the fiscal year earned. It is also conceivable he would have terminated his services with the University earlier when his earning ability because of the Mohs technique manifested itself sooner. It is not certain that he would have obtained significantly higher bonuses than

those in 1982–84, or that he would have left the University earlier. It must be observed that the benefits to the University were not unmatched by benefits to Dr. Zitelli. He received a desirable appointment to the Medical School, where, under its protective mantle and association with leaders in the academic community and teaching hospitals, he honed his skills, acquired a vital reputation ˙and established very important contacts with peers and other physicians in the area, if not the state and country. While pursuing his career at the Medical School, he was paid a reasonable base salary, supplemental salary and fringes which at all times maintained him at the 85th percentile or above in relation to the standards prescribed by the Association of American Medical Colleges. When Dr. Zitelli attempted to obtain the surplus from the DEAR fund, beyond the expenses of maintaining the program, he denied the University, and the Medical School in particular, the benefits of the practice plan which were then due pursuant to the nonprofit charitable foundation concept governing the operation. If, in every instance, the profits from the high money-producing programs such as DEAR, ophthalmology and orthopedics were drained off by individual physicians and those which could not sustain themselves because of a lower return on their services drew from University or Medical School funding sources, the net effect on the Medical School and University would be detrimental.

■■■ The financial statement presented by Drs. Eaglestein and Zitelli to DEAR and the Financial Committees of the University did not disclose the amount of deferred compensation going to Dr. Zitelli. His handling of this matter was at best concealing and in respect to the corporation law and his fiduciary responsibility as a director was improper. In respect to Dr. Zitelli's actions and behavior, appellants' citation to *Blofsen v. Cutaiar*, 460 Pa. 411, 333 A.2d 841 (1975), is on point. "It is well established that the burden rests on the party asserting estoppel to establish such estoppel by clear, precise and unequivocal evidence." *Id.*, 460 Pa. at 417–18, 333 A.2d at 844.

The essential elements of estoppel are "an inducement by the party sought to be estopped to the party who asserts the estoppel to believe certain facts exist—and the party asserting the estoppel *acts in reliance on that belief*." *Sabino v. Junio*, 441 Pa. 222, 225, 272 A.2d 508, 510 (1971) (emphasis in original).

Where the actions by the party asserting estoppel were such to promote the condition which now is asserted as an estoppel and the party to be bound by the estoppel did nothing to create the condition, estoppel cannot be alleged. Where there is no concealment, misrepresentation or other inequitable conduct by the other party, a party may not properly claim that an estoppel arises in his favor from his own omission or mistake. *Northwestern National Bank v. Commonwealth*, 345 Pa. 192, 27 A.2d 20 (1942).

While Dr. Zitelli claims the deferred compensation bonuses of $410,000 and $650,000 contributed to the Deferred Compensation Plan were known to DEAR, Dr. Abell testified these amounts were never discussed (R. 994a–995a; 1254a; 1487a–1490a). While Dr. Zitelli testified he relied heavily on professional and University officials, he denied attending several key meetings of accountants and lawyers meeting with Jerome Cochran, a University official who detailed the limits of deferred compensation plans, and refused to follow procedures and forms which required the involvement by the third director and the Dean of the Medical School. While the approval by the Dean was a proper implementation of the University policy, the failure of the Chancellor to find that this was not a rubber stamp for Dr. Zitelli's Deferred Compensation Plan was error. Likewise, it was error for the Chancellor to ignore Dr. Zitelli's conduct outside that policy and in violation of his fiduciary duties as a director of DEAR. He cannot absolve himself by claiming other directors either approved or ignored his actions as he had the affirmative duty as a director to assure that the Deferred Compensation Plan was properly created and that subsequent contributions were correctly approved. No place in the record does it appear

the Dean of the Medical School or University officials advised Dr. Zitelli that he did not have to comply with University Guidelines, DEAR/University agreements or the Pennsylvania Nonprofit Corporation Law (NCL), 15 Pa.C.S. § 5701 *et seq.*

In particular, most of the actions by Dr. Zitelli came into conflict with the NCL:

§ 5728. **Interested members, directors or officers; quorum.**

(a) **General rule.**—No contract or transaction between a nonprofit corporation and one or more of its members, directors or officers or between a nonprofit corporation and any other corporation, ... in which one or more of its directors or officers are directors or officers, or have a financial interest, shall be void or voidable solely for such reason, ... if:

(1) the material facts as to the relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors and the board in good faith authorizes the contract or transaction by the affirmative votes of a majority of the *disinterested directors* even though the disinterested directors are less than a quorum;

(2) the material facts as to the relationship or interest and as to the contract or transaction are disclosed or are known to the members entitled to vote thereon, if any, and the contract or transaction is specifically approved in good faith by vote of such members; or

(3) the contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified by the board of directors or the members.

*Id.* (emphasis added). The activities and transactions of Dr. Eaglestein did not comport with the requirements of this section in creation of the Deferred Compensation Plan and assigning funds to it between fiscal years 1984–85 and 1986–87. Appellee relies on submission of the financial report by DEAR of the years ending 1983 (Note J, deferred compensation), 1984 (Note G, deferred compensation), and

1985 (Note E, deferred compensation account). Aside from Note J (1983), the identity of the person for whom the deferred compensation account was created and the amount was not stated. Notes G and E in successive years identified the investments without identifying the physician or the amount contributed in the current year.

The Notes, in identical language state:

The foundation has deferred compensation agreement with one of its professional employees. Under the agreement, the Board of Directors shall determine annually an amount, if any, which shall be credited to an account for such employee. Any income or loss arising from the investment of these funds is to be credited or charged to the deferred compensation account.

A summary of the investment held in the deferred compensation account at June 30, 1986 is as follows....

From these statements the individual and the amount contributed in each calendar year, except the first, is not ascertainable. Unless the Dean of the Medical School was made aware of the amount of the contribution or the financial committee of the University was likewise apprised of the amount for the fiscal year and the individual to whom it applied, it is unreasonable to assume this would have attracted the requisite attention nor could it have been clear that the amount exceeded the $2\times$ base restriction. It was only after Dr. Abell was asked to sign the 1986 Deferred Compensation Payment Agreement that University officials and the then Dean of the Medical School were made aware of the amount and person for whom it was to be paid. It can only follow from the activities and the closed circle created by Drs. Zitelli and Eaglestein that an attempt to conceal must be inferred. Estoppel under these circumstances may not be sustained when the actions of the party claiming benefit of an estoppel create an estoppel against himself. *See* 28 Am.Jur.2d, Estoppel and Waiver § 116. Likewise, there is considerable doubt that a corporation of this nature, with more than sufficient members to compose a quorum with a disinterested majority, can vote for com-

pensation for the interested director when his vote did not constitute a majority and in one instance was the only vote. *See* 15 Pa.C.S. § 5728, *supra.* This subject is rather thoroughly analyzed in 18B Am.Jur.2d, Corporations § 1931:

> Although the directors are given general power to enact bylaws, they cannot enact a bylaw conferring on themselves the authority to fix salaries and under the authority thus conferred proceed afterward to vote themselves salaries. Nor will the auditing and approval of an unauthorized claim for services, by the auditing officers of the corporation, impart to it any validity.
>
> There is authority that a director cannot participate in a meeting at which his salary or compensation as an officer of the corporation is fixed, nor can he be counted in determining the presence of a quorum for effective action thereon by the board. But participation of a director in a meeting of a board of directors fixing his salary will not invalidate the action of the board where, in addition to the interested director, a majority of disinterested directors whose salaries were not involved therein were present and participated in the meeting. Similarly, a resolution fixing the salary of an interested director is not invalid because he voted for it, where a disinterested majority voted in favor of it. And to prove that a corporate officer breached his fiduciary duties by voting on his own compensation, it must be established that the act amounted to corporate waste or fraud.
>
> It is recognized that directors who are the sole stockholders in a corporation may vote themselves salaries. Indeed, it has been said that in a closely held corporation, where the directors are also the officers and stockholders, self-dealing on salary questions may be inevitable as a practical matter and does not of itself render void the board's action.

*Id.,* (footnotes omitted).

Our reading of the record and of the bylaws convinces us that only the University, through its Trustees Compensation Committee could fix salaries and the action of Dr.

Zitelli through the DEAR corporate structure could not supersede that power, nor could deferred compensation be approved and vested in a deferred compensation account by authority created solely through Dr. Zitelli's plan.

A final note in this regard is that the articles of incorporation of DEAR specifically provided:

[N]o part of the net earnings of the Corporation shall inure to the benefit of any private shareholder or individual, and no director, officer or employee of the Corporation shall receive any pecuniary benefits of any kind from the Corporation (except reasonable compensation for services in effecting the corporate purposes and reimbursement of payment of reasonable expenses incurred by them in the course of effecting such purpose).

(R. 1180a; R. 1267a.) The IRS, section 501(c)(3), for exempt status and section 509(a)(3), public foundation status, which election required it to use "all profit" for public charitable foundation purposes, precludes use of surplus for other than DEAR operations.

 No conceivable rationalization of these bylaws and Internal Revenue Commitments would permit a director of DEAR to establish a deferred compensation plan, which would take the surplus beyond expenses of the operation of DEAR, and apply it as deferred compensation.[7] A charitable nonprofit foundation may not be converted into a professional enterprise in which all the profits or net proceeds inure to the benefit of one of the members. The fact that there was an implied promise to have Dr. Zitelli's income keep pace with his financial contribution to DEAR does not

7. This is particularly so when University policy provided for an average increase in base salary of four per cent per year. Dr. Zitelli's base salary increased 62 per cent in year two, 16.6 per cent year three, 45.7 per cent year four, 7 per cent year 5, 4 per cent year 6 and 25.8 per cent year 7, for an average yearly increase of 26.85 per cent. In addition, after the third year he received the full doubling of his base salary in each of the succeeding four years. Testimony from University officials established that *any* deferred compensation was within the 2× base rule and not beyond it. If the bonuses of $30,000 in 1982–83 and $50,000 in 1983–84 are calculated into the salary as part of the supplemental salary, in those two years the supplemental salary exceeded the allowable 2× base provided in the University guidelines.

allow DEAR to become the vehicle to convert net income to deferred income for Dr. Zitelli. As illustrated in footnote 7, this promise was in fact kept by the rapidly accelerating base salary and supplemental salary provided by the University, which was unmatched by any other member of DEAR and a majority of physicians in other practice plans. The purpose of the foundation was to direct the surplus toward enhancing the goals of the medical school, while at the same time, through the practice plan, to assure full-time professors the opportunity to earn income which would enhance to a *reasonable degree* the teaching and research earnings. The Chancellor's failure to recognize the incongruity between Dr. Zitelli's actions and the clear mandate of the University policy agreements, DEAR bylaws and non-profit corporation laws created error which must be reversed. The estoppel claimed by Dr. Zitelli against the appellants is, at worst, countermanded by estoppel he creates against himself. This applies equally to the trust created for his children through which he leased equipment to DEAR, the automobile leased on his behalf by DEAR and the severance pay plan which failed to get any approval and was not even superficially acceptable because of the signature of Dr. Eaglestein after he terminated his employment with the University of Pittsburgh, the Medical School and DEAR.

### III. *Public Policy Considerations*

In reviewing the briefs and voluminous record of this case, it becomes evident very quickly, and is reinforced throughout, that this case did not involve a simple contractual undertaking between private interests which would have no impact on society or the public at large. Colleges and universities, from the time of the creation of the concept of the college in the garden of the de Medicis in Florence, to the creation of Harvard in America and the creation of Land Grant colleges during Lincoln's administration, have held a unique and protected position in western civilization. They have been sanctuaries for the intellectu-

ally advanced, repositories of the nation's intellectual endowment and creators of concepts and techniques which continually advance the betterment of society. To maintain this can be achieved and perpetuated without public and political support, financially and philosophically, is to ignore reality. No modern University the size and complexity of the University of Pittsburgh could survive without grants from the Commonwealth, subsidies and grants from the Federal Government, endowments from corporations, private foundations and individuals, and the benefit of tax concessions and legislation which permits retaining and recycling funds to maintain and advance the work of the University.

The record discloses that the University Guidelines and development of the practice plan concept originated out of the pressing need to develop full-time physician teachers who could not otherwise afford to work in academics. Implicit in the relationship created pursuant to these agreements and incorporations is public trust, in which the University assures reasonable compensation in exchange for providing the benefit and opportunity for those inclined to teach, to practice clinically and to serve the public good. It is fair to say that a physician who perceives such a relationship solely as a financial opportunity, regardless of what his skills and achievements are, should not be so employed. There has always been tension between the salaries and income of clinical practitioners and educators, which never appears to be capable of being balanced. Testimony by Edison Montgomery, who held positions such as Budget Director, Institutional Planner and Vice Chancellor at the University of Pittsburgh from 1956 to the 1980's, crystalizes the evolutionary nature of this problem.

It is ironic, when I first started in this business education was looked upon as a way of helping finance patient care and, indeed, the University used to pay salaries of house officers, residents and interns. As the years went on, instead of education helping subsidize patient care we now reached the place where patients'

care was subsidizing education. I won't try to draw any conclusions whether that is good or bad, but that is what has happened, and the development of the professional practice plans at the University is a clear symptom of that change.

(T.T., 12/20/89, p. 515.) In either respect the public interest aspects of medical education are ingrained in the funding approaches. The change in funding of education was in direct relationship to the increased availability of hospital and surgical insurance and Medicaid. It, of course, has a strong state-related component because of governmental contributions and grants to bolster the income of the medical schools.

It might also be pointed out that the University fought to retain control over medical school expenses and salaries and introduced the practice plan concept under pressure from "the strong faculty." *Id.* Attempts in 1983 to have very detailed auditing and accounting of exact compensation, bonuses and fringe benefits which every faculty member would be receiving from a faculty practice plan failed to receive approval because the practice plans were angry with it. *Id.* at 522. It was only with the appointment of Dr. Detre as Senior Vice President that more strict controls began to be applied to prevent the practice plans from doing things of which the University was unaware, hence the present litigation. *Id.* at 518, 522.

We could go on far more extensively about the public interest aspect of medical education, but it is sufficient to establish its existence for the purpose of relating it to application of the estoppel doctrine by appellee.

■ The burden of proof rests on the party asserting an estoppel to establish such estoppel by clear, precise and unequivocal evidence. *Blofsen, supra.* The following quote from American Jurisprudence synthesizes much of the public interest/public policy of the application of estoppel to this case.

§ 3. **Attitude and policy of the courts, generally.**

Inasmuch as the doctrine of estoppel operates, as stated by Lord Coke, to shut a man's mouth from speaking the truth, and is more or less in the nature of a forfeiture, estoppels have often been characterized as harsh or odious and not favored in the law. This characterization, however, has frequently referred to technical estoppels and is most often found in the earlier cases. In other cases, and especially in the more recent ones, estoppels, especially those known as "equitable" or "in pais," are not deemed odious but are said to be conducive to honesty and fair dealing and promotive of justice, *and to stand on the broad grounds of public policy and good faith.* The technicalities incident to estoppels have gradually given way to considerations of reason and practical utility, and *the courts of the present day seem disposed to give force and effect to a doctrine which is based upon principles of justice and the purest morality.* Estoppels are as readily and fully recognized in courts of law as in courts of equity. *Nevertheless, the doctrine of estoppel must be applied with great care and the equity must be strong in its favor.*

28 Am.Jur.2d, Estoppel and Waiver § 3 (emphasis added; footnotes omitted).

It is clear from our careful reading of the record appellee has failed to establish by the required evidentiary standard the existence of an estoppel against the University and DEAR, and as we have discussed above, clear evidence of a counterestoppel which adheres to the actions of Dr. Zitelli in consort with Dr. Eaglestein. Since estoppel is an equitable remedy and is founded on grounds of public policy and good faith, based upon principles of justice and morality, a series of transactions which results in bonuses of over one million dollars, arising in part from fortuitous payments because of recalculation of costs allowable for the surgical procedure, when Dr. Zitelli has been fully and fairly compensated for his work in the dermatology department in accordance with his agreements with appellant, is not equitable, in good

faith or in conformance with justice, morality and public policy.

Today, this country is entering into a wrenching debate because, increasingly, the best medical system in the world is failing to provide adequate medical care to the American people, leaving a substantial minority totally without care. The expense of college education, including medical training, is increasing at a far more rapid rate than inflation and other costs in society. Medical insurance is becoming increasingly unaffordable and restrictive in coverage. Within the medical profession there are wide disparities in income due to market forces which provide for more income to a surgeon than a family practitioner. These same forces are exhibited in this case whereby some specialties produce very high revenues through their practice plans, and others are not self-sustaining. It cannot be good public policy to enrich some physicians and practice plans while other equally important specialties, because of the idiosyncrasies of our system, are struggling. The intent of the practice plans can only be achieved by providing physicians in the plan a fair remuneration for their skills, effort and sacrifice, which must be controlled by the University policies and agreements to assure they do not become subverted to a totally laissez faire operation. Since these functions are regulated by bylaws and corporate charters of nonprofit and charitable foundations, no individual may be unduly enriched by the income received by the plans. Surpluses, if any, beyond maintaining the operation of each department must inure to the benefit of the Medical School and ultimately the University. Only by reversing the findings of the Chancellor may this be achieved.

The Decree of the Chancellor is hereby vacated and the following Order is entered:

The withdrawal by the University of Pittsburgh of $400,-000 from the deferred compensation account is approved.

The deferred compensation account is dissolved and the funds contained therein are awarded to the use of the Medical School.

The expense attributable to the lease of Dr. Zitelli's automobile is hereby reimbursable to DEAR.

The amount attributable to the lease of the equipment to DEAR from Dr. Zitelli, paid for by DEAR, is to be reimbursed to DEAR.

The claim by appellants for return of DEAR records is denied as there is insufficient evidence to establish the specific records claim.

The severance plan for Dr. Zitelli is hereby disallowed.

The appellee's complaint is dismissed with prejudice.

Jurisdiction relinquished.

Dissenting statement by MONTGOMERY, J.

MONTGOMERY, Judge, dissenting:

I respectfully dissent. I strongly disagree with the factual determinations, the legal conclusions and the decision of the majority in this case.

In my view, the majority has improperly substituted its own factual judgments for those reached by the chancellor, despite the fact that the chancellor's findings were well-supported by adequate evidence. It is clear that the findings of a chancellor are controlling, and the trial court's decree should not be reversed on appeal, unless it appears either that the court abused its discretion or that its findings lack evidentiary support, or if it is evident that the chancellor capriciously disbelieved the evidence. *Davis v. Buckham*, 280 Pa.Super. 106, 421 A.2d 427 (1980). A detailed review of the record mandates the conclusion that the chancellor had more than sufficient evidence to support his factual findings.

Moreover, the chancellor's conclusions of law were clearly correct and provide no basis for reversal. I disagree with the legal conclusions reached by the majority to support its order, and in particular, cannot join in the majority's "Public Policy Considerations" discussion and analysis.

I would affirm the trial court's decree.