631 A.2d 1058

**The ARTKRAFT STRAUSS SIGN CORPORATION**

**v.**

**William R. DIMELING and Richard Schreiber, t/a Classic Outdoor Advertising, Co. and Myron Levin,**

**Appeal of Myron LEVIN.**

Superior Court of Pennsylvania.

Argued July 1, 1993.

Filed Oct. 5, 1993.

---

66

Evan Levow, Cherry Hill, NJ, for appellant.

Kara L. Svendsen, Philadelphia, for Dimeling, appellee.

Before DEL SOLE, BECK and HESTER, JJ.

HESTER, Judge:

Myron Levin appeals from the June 16, 1992 judgment[1] entered by the Philadelphia Court of Common Pleas following the denial of post-trial motions. Sitting as the factfinder, the court ordered appellant to pay Classic Outdoor Advertising Co. ("Classic") the sum of $30,000 and The Artkraft Strauss Sign Corporation ("Artkraft") the sum of $7,500. Appellant argues that the trial court committed numerous errors. We affirm.

The record, viewed in the light most favorable to appellees as verdict winners, reveals the following. Appellant was an experienced commission salesman for Continental Outdoor Advertising Co. ("Continental") in the outdoor sign advertising business and went into business for himself as a del credere broker, an independent agent who relies on the credit of his principals. He attempted to complete a project on his own which his former employer had elected not to pursue.

The availability of space for billboards at the location involved in this appeal, the intersection of Tenth Avenue and Forty–First Street, just outside the Lincoln Tunnel in Manhattan, New York, is limited. Kelly Operating Co. ("Kelly") leased and operated a gasoline service station at this location. It entered into a sublease with Continental to permit erection of a sign at this location (hereinafter the "sublease"). Kelly represented that it had the authority of the purported owner, St. Raphael's Church, to make this sublease and to permit the erection of an advertising sign.

The Claridge at Park Place, Inc, t/a Claridge Hotel & Casino and Continental previously had executed a ten-year commitment for advertising on a sign. The sign, to display "Tropicana," the name of a casino located in Atlantic City, New Jersey, was to be erected at this location near the

---

1. We note that the caption incorrectly indicates that the appeal is from an order when judgment subsequently was entered.

Lincoln Tunnel (hereinafter referred to as the "advertising contract"). Appellant combined the advertising contract and the Kelly sublease, and sold this arrangement to Classic, an investment partnership comprised of William Dimeling and Richard Schreiber ("Classic"). Classic's investment provided the funding for this project which was a "turn-key" deal, i.e. an investment in the cash flow of a project without any future obligation to perform under the contract. Finally, appellant persuaded Classic to execute a contract directly with Artkraft, which had expertise in obtaining zoning permits and in constructing large signs and which would be able to supply the proper documentation for the zoning exception required to obtain a construction permit. This contract called for Artkraft to design, construct, and paint the sign.

Reviewing the situation, the following information is pertinent. First, there was the sublease of the gas station from Kelly, which ran from December 1, 1984, to November 30, 1994, for a total rental of $18,000, which was assigned to Classic. The sublease was made contingent upon the erection and maintenance of a sign. Next, Classic contracted to purchase or invest in the turn-key arrangement for $96,000, which it would pay directly to appellant, plus reimburse the $6,000 deposit and advance rent already paid to Kelly for the sublease. In return, Classic would become the owner of the sign and would receive $9,000 per month ($108,000 per year for ten years or $1,080,000) from Tropicana plus tax deductions for investment costs. Appellant, who was not a party to the construction contract, would profit from the sale of this arrangement to Classic for $102,000, which included New York sales tax, minus his cost of $10,000 which he promised he would pay to Artkraft. Continental was not a party either to the construction or to the investment contract.

Classic meanwhile entered into the construction contract with Artkraft in which Artkraft was to design, obtain, and assemble the parts to erect a sign. The amount of the contract included a deposit of $40,000, $40,000 due upon completion, and the balance due thirty days after completion. In addition, appellant agreed to pay $10,000 if the sign was

completed by a date certain as required by Claridge. The construction involved cutting an aluminum pole and crossbeam and some wood to construct the frame and face of the sign. Artkraft commenced performance under the construction contract as a consequence of lead times and the need to perform by a date certain. The pole was inserted, and the wood cut for the frame.

However, Leroy Realty Co. (Leroy), the true lessor of the gas station, obtained an injunction preventing erection of the sign. This occurred after Artkraft severed a utility line while inserting the pole for the sign. Leroy asserted it never gave Kelly authority to execute a sublease or to authorize construction of a sign on the gas station property. It declined to reconsider its refusal or to permit any alternative. Essentially, Kelly had misrepresented the identity of its lessor. Without the permission or authority of the owner of the gas station, it was impossible for the sign to be constructed. Artkraft had expended $50,000 to obtain and assemble parts for the sign, even though it had not yet been erected.

Artkraft instituted this action against Classic, a Pennsylvania corporation which had its offices in Philadelphia, seeking damages of $110,000, representing both the costs it incurred and its lost profit. Artkraft also joined appellant as Classic's agent in order to recover the $10,000 which he promised to pay. Thus, Classic lost its deposit with Artkraft, and Artkraft lost its profit in addition to the $50,000 already expended, less the $40,000 deposit from Classic which it retained. Classic also sought to recover its $40,000 deposit from appellant. The court resolved this triangular situation by ordering appellant to pay Classic $30,000 and Artkraft $7,500 on a theory of promissory estoppel. It reasoned that appellant, as an independent agent, was most responsible among innocent parties since he was the one who dealt directly with Kelly, who actually misrepresented its authority to sublease its premises. Artkraft and Classic relied on appellant's representations that Kelly had proper authority to sublease. The court utilized the principles of legal impossibility and promissory estoppel to hold appellant liable. It also found it would not be feasible to

re-use the materials, so the amount Artkraft expended on the project was not reduced by the value of these materials. This appeal followed.

 Appellant first argues that the trial court improperly utilized the theory of legal impossibility rather than finding the contract void *ab initio* due to mutual mistake. Appellant claims that he was an innocent party, who was unaware of Kelly's lack of authority to assign the lease or sublease. Accordingly, appellant maintains, as there is no place to erect a sign, there never was a "meeting of the minds," since a material element necessary to form a valid contract was missing. He further claims that mutual mistake voids the contract and excuses any obligation he may have. Appellant seeks recision of the contract based upon mutual mistake. *See Loyal Christian Benefit Ass'n v. Bender*, 342 Pa.Super. 614, 493 A.2d 760 (1985); *Cobaugh v. Klick–Lewis, Inc.*, 385 Pa.Super. 587, 561 A.2d 1248 (1989). As a result, he asserts that each party should be left as is to bear its own loss. *McNeely v. Philadelphia Nat'l Bank*, 314 Pa. 334, 172 A. 111 (1934).

We disagree. In this instance, neither appellee can be made whole through recision. The misrepresentation or fraud perpetrated by Kelly clearly is an unexpected event that totally frustrates the intent and purpose of the parties to these contracts. Nevertheless, there is reliance as well as uncompensated losses, and recision will not make the parties whole. Accordingly, recision of the contract is not appropriate. *See Sanders v. Lawn Mutual Ins. Co.*, 194 Pa.Super. 491, 168 A.2d 758 (1961) (recision as a result of mutual mistake is not applicable where parties are not rendered whole).

 Further, it long has been clear that under certain circumstances, where two innocent parties suffer as the result of the fraud of a third, the one who has accredited him must bear the loss. In *Rothman v. Fillette*, 503 Pa. 259, 265, 469 A.2d 543, 545 (1983), our Supreme Court quoted *Rykaczewski v. Kerry Home, Inc.* 192 Pa.Super. 461, 161 A.2d 924, 926 (1960), for the proposition that "[w]here one of two innocent persons must suffer, the loss should be borne by him who put

the wrongdoer in a position of trust and confidence and thus enabled him to perpetuate the wrong." Moreover, this principal is not limited to actual agency situations. In *Zitelli v. Dermatology Foundation*, 409 Pa.Super. 219, 230, 597 A.2d 1173, 1178 (1991), we stated that "[e]stoppel applies when action, inaction or negligence by a party ... leads the other party ... to act, thereby precluding the first parties from asserting a legal defense to the action by the second party." In the instant case, the trial court applied this principal and determined that appellant's negligence induced reliance by the other parties making the loss possible, and therefore, appellant should bear the loss.

Appellant argues this was error in that this case authority is distinguishable on the basis that he is no more at fault than the other parties who also did not investigate Kelly's authority. He claims that appellees equally were negligent. Thus, he maintains that equity should not be invoked where he is no more at fault than the other parties, and there was no active concealment, misrepresentation or other inequitable conduct on his part to justify invoking estoppel against him. Appellant relies upon *Zitelli v. Dermatology Foundation, supra,* where we stated:

> The essential elements of estoppel are "an inducement by the party sought to be estopped to the party who asserts the estoppel to believe certain facts exist—and the party asserting the estoppel *acts in reliance on that belief.*" *Sabino v. Junio*, 441 Pa. 222, 225, 272 A.2d 508, 510 (1971) (emphasis in original).

> Where the actions by the party asserting estoppel were such to promote the condition which now is asserted as an estoppel and the party to be bound by the estoppel did nothing to create the condition, estoppel cannot be alleged. Where there is no concealment, misrepresentation, or other inequitable conduct by the other party, a party may not properly claim that an estoppel arises in his favor from his own omission or mistake. *Northwestern National Bank v. Commonwealth*, 345 Pa. 192, 27 A.2d 20 (1942).

*Id.*, 409 Pa.Super. at 247, 597 A.2d at 1187. Appellant insists that appellees had an equal obligation to verify Kelly's authority to sublease.

We disagree. Appellant dealt directly with Kelly and was in the best position to verify its representations and to bear the loss. Appellant did more than overlook a nuance in the deal. He effectively vouched to others that Kelly possessed authority to sublease the property to the other parties. He structured and promoted the transaction. Yet, appellant did nothing to verify Kelly's authority such as requesting a copy of the original lease or the signed consent of the lessor. This failure and his subsequent active representations to the other parties that Kelly did have the proper authority to assign the lease, in our view, constitutes sufficient grounds to invoke equitable relief and supports invoking both equitable and promissory estoppel. *See Cardamone v. University of Pittsburgh*, 253 Pa.Super. 65, 384 A.2d 1228 (1978) (courts may enforce promises unsupported by consideration in order to avoid a manifest injustice). Appellant's actions, more than any other party, made these losses possible.

We do not find that appellees' failure to inquire independently regarding Kelly's authority rises to such a level in this instance as to preclude resort to equitable and promissory estoppel. Appellant vouched for Kelly's authority by promoting this deal. It is reasonable for appellees to look to him. *See Doppler v. Doppler*, 393 Pa.Super. 600, 574 A.2d 1101 (1990) (equitable principals protect the reasonable expectations of a party who relies on another's conduct). Consequently, we reject appellant's argument.

Judgment affirmed.