**KEYSTONE FILLER & MFG. CO., INC., Plaintiff,**

v.

**AMERICAN MINING INSURANCE COMPANY, Defendant.**

**No. 4:CV–99–1947.**

United States District Court, M.D. Pennsylvania.

Jan. 16, 2002.

434

Michael D. Collins, Stroudsburg, PA, for plaintiff.

J. Scott Kramer, Duane, Morris & Heckscher, LLP, Philadelphia, PA, for defendant.

### MEMORANDUM

MCCLURE, District Judge.

### BACKGROUND:

Keystone Filler & Mfg. Co., Inc. (Keystone) is suing its insurer, American Mining Insurance Company (AMI). Keystone asserts that AMI breached an insurance contract when it wrongfully denied coverage for Keystone's claim for damages sustained by one of its customers, Rutland Plastic Technologies (Rutland). Keystone asserts an additional claim for bad faith by an insurer under 42 Pa.C.S.A. § 8371. We have diversity jurisdiction. 28 U.S.C. § 1332.

Before the court are (1) AMI's motion for summary judgment; and (2) Keystone's motion for partial summary judg-

ment, which requests judgment as a matter of law as to the breach-of-contract claim only. AMI contends that as a matter of law, Keystone's claim relating to Rutland's damages was not covered under Keystone's policy. According to AMI, Rutland's underlying claim against Keystone would have been merely for breach-of-contract. AMI then points to a body of case law from the Pennsylvania Superior Court stating that claims against an insured for breach-of-contract are not covered under a commercial general liability policy such as the one in question. Keystone attempts to discredit this line of cases, and it argues in the alternative that AMI should be estopped from denying coverage because it paid a previous almost identical claim for Keystone. Keystone also contends that because it settled the claim with Rutland, and because the claim relating to Rutland's damages was covered under the policy, AMI must indemnify it for the settlement. For the following reasons, we will deny Keystone's motion and grant summary judgment to AMI.

## DISCUSSION:

### I. ROLE OF A FEDERAL COURT

A federal court sitting in diversity must apply state substantive law and federal procedural law. *Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3d Cir.2000) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). In this case, it is undisputed that Pennsylvania law applies. In the absence of a reported decision by the state's highest court addressing the precise issue before it, a federal court applying state substantive law must predict how the state's highest court would rule if presented with the case. *See Nationwide Mutual Ins. Co. v. Buffetta*, 230 F.3d 634, 637 (3d Cir.2000) (citation omitted). A federal court may give due regard, but not conclusive effect, to the decisional law of lower state courts. *Id.*

(citation omitted). "The opinions of intermediate appellate state courts are 'not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" *Id.* (quoting *West v. AT & T Co.*, 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139 (1940)). "In predicting how the highest court of the state would resolve the issue, [a federal court] must consider 'relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand.'" *Id.* (quoting *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 663 (3d Cir.1980)).

### II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c).

The moving party bears the initial responsibility of stating the basis for its motions and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. at 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). It can discharge that burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548.

Once the moving party points to evidence demonstrating that no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists

and that a reasonable factfinder could rule in its favor. *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 252 (3d Cir.1999) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "Speculation and conclusory allegations do not satisfy this duty." *Ridgewood*, 172 F.3d at 252 (citing *Groman v. Township of Manalapan*, 47 F.3d 628, 637 (3d Cir.1995)).

### III. STATEMENT OF FACTS

Keystone is a company that manufactures carbon-based products made from finely-ground coal. AMI issued Keystone a general commercial liability insurance policy with a coverage period from March 1, 1998 to March 1, 1999. (*See* Policy numbered AMGL002170 (AMI 1998 Policy), attached as Exhibit A to Defendants' Motion for Summary Judgment, Rec. Doc. No. 19.)

Rutland was Keystone's customer at all relevant times. Keystone sold Rutland a batch of Mineral Black 123, a carbon-based product made from finely-ground coal. Rutland used Keystone's product as a component of a material called plastisol, which is used to manufacture other goods such as automobile filters. Through correspondence with Keystone in February 1999, Rutland claimed that a batch of Mineral Black 123 contained oversized particles and damaged a certain amount of plastisol, rendering it useless. According to Rutland, the defective plastisol caused damages both to Rutland itself and to two of Rutland's customers. Rutland claimed more than $65,000 in damages.

Keystone filed a claim under its AMI policy in order to be covered for Rutland's damages. AMI investigated but denied Keystone's claim.

After AMI denied coverage, Keystone and Rutland entered into an agreement by which Keystone was to sell Mineral Black 123 to Rutland at a reduced price until Rutland's damages were satisfied.

In 1997, Shiraishi Calcium Kaisha, Ltd., a company located in Japan, filed a claim against Keystone, complaining of oversized particles in another one of Keystone's products, Mineral Black 325A. Shiraishi claimed that its customer, Nishikawa Rubber Company, suffered damages of $12,690. Keystone submitted the Shiraishi claim to AMI, which adjusted and settled the claim without reservation under Keystone's 1997 policy.

### IV. ANALYSIS

It is undisputed that Pennsylvania law applies to the analysis of the AMI policy. The policy states:

b. This insurance applies to "bodily injury" and "property damage" only if:

 (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

 (2) The "bodily injury" or "property damage" occurs during the policy period.

(AMI 1998 Policy at § 1, ¶ 1(b).) The parties agree that for the purposes of this case, AMI must indemnify Keystone only in the event of "'property damage' to a third party if the 'property damage' is caused by an 'occurrence.'" (Plaintiffs' Brief in Support of its Motion for Partial Summary Judgment, Rec. Doc. No. 22, at 9.) AMI contends that there existed neither property damage nor an occurrence. It also argues that coverage is barred by either or both of two coverage exclusions stated in the policy. Keystone contends that there indeed was property damage caused by an occurrence, and asserts that neither exclusion applies to its claim. It also contends that because it settled the

claim with Rutland, and because the claim relating to Rutland's damages was covered under the policy, AMI must indemnify it for the settlement.

 First, we state certain general rules under Pennsylvania law relating to the construction of insurance policies. "First, the court must 'ascertain the intent of the parties as manifested by the language of the policy.'" *Jacobs Constructors, Inc. v. NPS Energy Services, Inc.*, 264 F.3d 365, 375–76 (3d Cir.2001) (quoting *Standard Venetian Blind Co. v. American Empire Ins. Co.*, 503 Pa. 300, 469 A.2d 563, 566 (1983)). "In doing so, an insurance policy must be read as a whole and its terms, when unambiguous, must be construed according to their plain and ordinary meaning." *Id.* at 376 (citing *Pennsylvania Mfrs.' Ass'n Ins. Co. v. Aetna Cas. & Sur. Ins. Co.*, 426 Pa. 453, 233 A.2d 548, 551 (1967); see also *Koval v. Liberty Mut. Ins. Co.*, 366 Pa.Super. 415, 531 A.2d 487, 489 (1987)). "Where a provision is ambiguous, it must be construed in favor of the insured." *Id.* (citing *Standard Venetian Blind Co.*, 469 A.2d at 566). "A provision is ambiguous if reasonable persons, after considering the context of the entire policy, would honestly differ as to its meaning." *Id.* (citing *Lucker Mfg. v. Home Ins. Co.*, 23 F.3d 808, 814 (3d Cir. 1994)). "However, the court should read the policy to avoid ambiguities and not torture the language so as to create them." *Id.* (citing *St. Paul Fire & Marine Ins. Co. v. United States Fire Ins. Co.*, 655 F.2d 521, 524 (3d Cir.1981)).

The inquiry into whether claims are covered under an insurance policy is usually made in the context of the insurance company's duty to defend or indemnify the insured in a civil action brought by a third party against the insured. The analysis is normally done by reference to the allegations of the civil complaint, and the court accepts the allegations as true in determining whether a claim could be covered. If the third party's claim against the insured is one that would be covered under the policy, the insurance company may be liable to the insured for defense, indemnification, or both. *See, e.g., id.* at 376. It is important to note that Rutland never initiated a lawsuit against Keystone. Rather, Rutland, through correspondence, informed Keystone of its damages, and Keystone settled Rutland's informal claim by agreeing to sell Mineral Black 123 to Rutland at a reduced price. (*See* Defendant's Exhibits C, D, attached to its motion for summary judgment, Rec. Doc. No. 19.) We will treat Rutland's correspondence the way we would have treated a formal complaint. The correspondence sufficiently lays out Rutland's factual allegations, and we will not penalize Keystone for settling the claim before the commencement of formal litigation.

 First, we determine whether Rutland's underlying claim was indeed one for "property damage." The AMI policy defines property damage as:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(AMI 1998 Policy at § 5, ¶ 15.)

In its correspondence, Rutland claimed that 2,105 gallons of plastisol were rendered unusable because of Keystone's oversized particles of Mineral Black 123, which of course were included in the process of manufacturing the plastisol. (Ex-

hibit C to Defendant's Motion for Summary Judgment, Rec. Doc. No. 19.) In analyzing under Pennsylvania law an indistinguishable clause from another general liability policy, the Third Circuit has held that property damage occurs when a third party incorporates the insured's product into a new product having a value in excess of the original product supplied by the insured, and suffers damage to more than only the insured's product. *See Imperial Casualty and Indemnity Co. v. High Concrete Structures, Inc.*, 858 F.2d 128, 134–36 (3d Cir.1988). In *Imperial Casualty*, the court held that a manufacturer of steel washers sustained "property damage" when it incorporated the insured's defective steel into a brand new product, the steel washers. Relying on *Pittsburgh Plate Glass Co. v. Fidelity & Casualty Co. of New York*, 281 F.2d 538 (3d Cir.1960), the court noted that property damage occurred because "the purchaser created a new product having a value in excess of the value of the product supplied by the insured, and suffered damage to more than just the insured's product."

As with the manufacturer's claim in *Imperial Casualty*, Rutland's claim was for "property damage" because the purchaser (Rutland) created a new product (plastisol) presumably in excess of the value of the product supplied by the insured (Mineral Black 123), and allegedly suffered damage to more than just the Mineral Black 123.

AMI next argues that coverage is barred by either or both of two of the policy's exclusions, Exclusion m and Exclusion n. Neither exclusion applies.

■ Exclusion m, entitled "Damage to Impaired Property or Property Not Physically Injured," excludes from coverage:

> "Property damage" to "impaired property" or property that ***has not been physically injured***, arising out of:

> (1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

> (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement accordance with its terms.

> This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

(AMI 1998 Policy at § 1, ¶ m.) (emphasis added).

The *Imperial Casualty* court found that a similar exclusion was "on its face inapplicable" because the previously mentioned steel washers were physically injured. *Imperial Casualty*, 858 F.2d at 136. Similarly, because Rutland's claim was that the plastisol was physically injured, this exclusion is "on its face inapplicable." *See also Lang Tendons v. Northern Ins. Co. of New York*, No. CIV. A. 00–2030, 2001 WL 228920, at *9 (E.D.Pa. March 7, 2001) (finding that an identical exclusion "does not apply if there is physical injury to property other than the insured's work itself") (citing *Imperial Casualty*, 858 F.2d at 136).

■ Exclusion n, entitled "Recall of Products, Work or Impaired Property," excludes from coverage:

> Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

> (1) "Your product";

> (2) "Your work"; or

> (3) "Impaired property";

> if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected

defect, deficiency, inadequacy or dangerous condition in it.

(AMI 1998 Policy at § 1, ¶ n.) "This exclusion [is] called the 'sistership exclusion' because it applies where products are recalled because of known defects in their sister products[.]" *Imperial Casualty*, 858 F.2d at 136. "The product to look to ... is that sold by [the insured]." *Id.* at 137. If the damages claimed have nothing to do with a withdrawal from the market or from use, the exclusion is inapplicable. *Id.* Because Rutland's damage claims have nothing to do with the withdrawal from the market or from use of Mineral Black 123, the exclusion does not apply. *See id.* (concluding that exclusion did not apply where underlying damage did not concern a withdrawal from the market or from use of the insured's steel).

■ Finally, we examine whether Rutland's claims demonstrated the existence of an "occurrence" under the policy. The policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (AMI 1998 Policy at § 5, ¶ 12.) The Pennsylvania Superior Court has held that the existence of an "occurrence" under similar policies depends on whether the underlying damage was caused by a tort or was caused by a breach-of-contract, and has dismissed cases in which the underlying damage claim—that is, the claim brought by a third party against the insured—was one for breach-of-contract. The seminal case is *Redevelopment Authority of Cambria County v. International Insurance Co.*, 454 Pa.Super. 374, 685 A.2d 581 (1996) (en banc). In that case, the Redevelopment Authority had entered into a contract with a municipality in which the Redevelopment Authority would supervise improvements to the municipal water system. *Id.* at 583. In an underlying state-court action, the municipality claimed that the Redevelopment Authority "had failed to 'properly perform' the duties it had assumed under the contract, had been negligent, and had been unjustly enriched as a result of the retention of the monies paid to it to administer the project." *Id.* at 584. The Redevelopment Authority requested that the insurance company defend and indemnify it. The insurance company asked the court to declare that it had no duty to defend or indemnify, arguing that there was no "occurrence" under the policy.

The Superior Court analyzed the insurer's argument. It noted that "[t]he purpose and intent of [a general liability] insurance policy is to protect the insured from liability for essentially accidental injury to the person or property of another rather than coverage for disputes between parties to a contractual undertaking." *Id.* (citing, *inter alia*, *Phico Insurance Co. v. Presbyterian Medical Services Corp.*, 444 Pa.Super. 221, 663 A.2d 753, 756–57 (1995); *Ryan Homes, Inc. v. Home Indemnity Co.*, 436 Pa.Super. 342, 647 A.2d 939, 942 (1994)). Quoting *Phico*, the court reasoned that allowing coverage for breaches-of-contract would unfairly make the insurance company into a party to the contract:

To allow indemnification under [a breach of contract theory] would have the effect of making the insurer a sort of silent business partner subject to great risk in the economic venture without any prospects of sharing in the economic benefit. The expansion of the scope of the insurer's liability would be enormous without corresponding compensation. There is simply no reason to expect that such a liability would be covered under a comprehensive liability policy which has, as its genesis, the purpose of protecting an individual or entity from liability for essentially accidental injury to another individual, or property damage to another's possessions, even if, perhaps, the

coverage of the policy has been expanded to cover other non-bodily injuries that sound in tort.

*Id.* at 590 (quoting *Phico*, 663 A.2d at 757–758).

The *Redevelopment Authority* court went on to enunciate the test for distinguishing between claims that sound in tort (and therefore are an "occurrence" within the scope of policy coverage) and claims that sound in contract (and therefore are outside the scope of policy coverage). "[T]o be construed as a tort action, the wrong ascribed to the defendant must be the gist of the action with the contract being collateral." *Id.* (quoting *Phico*, 663 A.2d at 757) (other citations omitted). The court made it clear that "a contract action may not be converted into a tort action simply by alleging that the conduct in question was done wantonly." *Id.* (quoting *Phico*, 663 A.2d at 757) (other citations omitted). The court then stated that "the important difference between contract and tort actions is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed by mutual consensus." *Id.* (quoting *Phico*, 663 A.2d at 757) (other citations omitted).

The *Redevelopment Authority* court decided that these considerations were consistent with those followed by other jurisdictions, including New Jersey, Wyoming, and Alaska. *Id.* at 590–92. Applying this test, the court concluded that the underlying action sounded in contract and was outside the scope of the policy's coverage, even though the complaint included a claim for negligence. The rule in *Redevelopment Authority*—that there is no "occurrence" if the underlying claim is one merely for breach-of-contract—has been followed by numerous state and federal courts sitting in Pennsylvania. *See, e.g., Snyder Heating Co., Inc. v. Pennsylvania*

*Mfr. Ass'n Ins. Co.,* 715 A.2d 483, 485 (Pa.Super.1998); *Pro Dent, Inc. v. Zurich U.S.,* No. CIV. A. 99–5479, 2001 WL 474413, at *2 (E.D.Pa. April 30, 2001); *Augenblick v. Nationwide Insurance Co.,* No. Civ.A. 99–3419, 1999 WL 975118, at *3–*5; *Jerry Davis, Inc. v. Maryland Insurance Co.,* 38 F.Supp.2d 387, 390–92 (E.D.Pa.1999).

AMI contends that any claim brought by Rutland would necessarily have been for breach-of-contract—specifically, a simple breach-of-warranty claim under Article 2 of the Uniform Commercial Code. Keystone does not deny that Rutland's claim is akin to one of breach-of-contract or warranty; rather, it attempts to discredit *Redevelopment Authority* and its progeny. Keystone argues two points. First, it contends that a footnote in *Imperial Casualty,* the above-mentioned Third Circuit case, is binding precedent stating that courts, when determining the existence of an "occurrence" under commercial general liability policies, are to focus not on the distinction between tort liability and contract liability, but on the interpretation of the specific insurance policy in question. *See Imperial Casualty,* 858 F.2d at 134 n. 7. Second, it asserts that a principal case that *Redevelopment Authority* cites for support has been abrogated, and that therefore *Redevelopment Authority* lacks a sound foundation.

In *Imperial Casualty,* a general liability insurer, USF & G, brought a declaratory judgment action regarding its obligation to defend a Pennsylvania state court breach-of-contract action against its insured, High Steel. USF & G argued a position similar to the *Redevelopment Authority* contract/tort distinction, but the court rejected USF & G's position:

Another argument pressed by USF & G is that because Pennsylvania law does not permit a person complaining of only

injury to the defective product itself to recover in tort, and only contract remedies are available against High Steel, tort-oriented comprehensive general liability insurance "is not available to protect High Steel." Appellee–Cross Appellant's Brief at 26–28. What is at issue here, however, is not the distinction between tort and contract liability but a specific insurance contract that must be interpreted according to well-established rules of construction.

*Imperial Casualty,* 858 F.2d at 134 n. 7. Analyzing the policy, the Third Circuit eventually found that USF & G had a duty to defend High Steel in the state action. Keystone argues that footnote seven of *Imperial Casualty* is directly in opposition to *Redevelopment Authority;* that is, that it instructs that in determining the existence of an "occurrence," a court is to look not at whether the underlying claim is one of tort or contract, but at the specific terms of the policy.

Next, Keystone points out that one of the cases relied on by the *Redevelopment Authority* court has been discredited. The *Redevelopment Authority* court cited a holding by the Wyoming Supreme Court, in which the Wyoming court analyzed a provision in a general liability policy stating that the insurer will pay damages that the insured becomes "legally obligated to pay." The Wyoming court cited a California case, *International Surplus Lines Ins. Co. v. Devonshire Coverage Corp.,* 93 Cal. App.3d 601, 155 Cal.Rptr. 870 (1979):

> Courts universally have interpreted liability-coverage provisions, identical to that found in appellants' policy, as referring to liability sounding in tort, not in contract. *International Surplus Lines Ins. Co. v. Devonshire Coverage Corp.,* 93 Cal.App.3d 601, 155 Cal.Rptr. 870 (1979), is a representative case.

*Redevelopment Authority,* 685 A.2d at 591 (citing *Action Ads Inc. v. Great American Insurance Co.,* 685 P.2d 42, 43–45 (Wyo. 1984)). The *Redevelopment Authority* court went on to summarize *International Surplus,* which embraced the contract/tort distinction in general liability policies. Keystone points to a California Supreme Court case—decided after *Redevelopment Authority*—that expressly abrogated *International Surplus.* See *Vandenberg v. Superior Court,* 21 Cal.4th 815, 88 Cal. Rptr.2d 366, 982 P.2d 229 (1999). *Vandenberg* disapproved of distinguishing between contract actions and tort actions when deciding coverage, and held that the term "legally obligated to pay" could refer to either tort law or contract law:

> The nature of the damage and the risk involved, in light of particular policy provisions, control coverage. Moreover, we reject the ex contractu/ex delicto distinction, which derives from a misreading of the seminal case, *Ritchie v. Anchor Casualty Co.* (1955) 135 Cal.App.2d 245, 286 P.2d 1000 (*Ritchie* ). In *Ritchie,* the court analyzed whether the term "liability imposed by law," the precursor to "legally obligated to pay," included coverage for liability arising from contract. (*Id.* at p. 254, 286 P.2d 1000.) This phrase had usually been construed to mean liability imposed in a definite sum by a final judgment against the assured. (*Ibid.*) But the policy before the *Ritchie* court contained a distinction; coverage A applied to " 'liability imposed ... by law or by written contract,' " whereas coverage B applied to " 'liability imposed ... by law.' " (*Ibid.*) The court concluded that the omission of the term " 'or by written contract' " in coverage B, the portion at issue in *Ritchie,* "is persuasive that the phrase 'imposed upon him by law' " as used in this policy ... relates to the nature of the liability to be

442

defended rather than the result of the lawsuit .... (*Ibid.,* italics added.)

In *International Surplus, supra,* 93 Cal.App.3d 601, at page 611, 155 Cal. Rptr. 870, the phrase at issue was " 'legally obligated to pay as damages' " which the court found synonymous with " 'damages for a liability imposed by law,' " the coverage language in the *Ritchie* case. Without further discussion, the court then held that the "latter phrase has been uniformly interpreted as referring to a liability arising ex delicto as distinguished from ex contractu." (*Ibid.,* citing *Ritchie, supra,* 135 Cal. App.2d 245, 286 P.2d 1000, italics added.) This brief statement led to a string of cases relying upon *International Surplus* for the purported distinction between tort and contract damages. These later cases fail to consider, however, the particular and explicit coverage language before the *Ritchie* court, and thus create an arbitrary distinction that ignores otherwise settled principles of insurance contract interpretation.

*Vandenberg,* 88 Cal.Rptr.2d 366, 982 P.2d at 239. Keystone argues that based on *Redevelopment Authority* 's reliance on *International Surplus* and the California Supreme Court's subsequent abrogation of *International Surplus,* the tort/contract distinction is a fallacy. Thus, according to Keystone, *Redevelopment Authority* is invalid and should not apply in the instant case. As a corollary, Keystone also attempts to distinguish each of the other non-Pennsylvania cases cited in *Redevelopment Authority.*

We find that notwithstanding Keystone's assertions to the contrary, the tort/contract distinction is valid. Keystone painstakingly attempts to distinguish or otherwise discredit a large number of cases cited in *Redevelopment Authority,* but it ignores *Phico,* the Pennsylvania Superior Court case that sets out the rationale for excluding coverage for contract claims. *Phico* was one of the principal cases cited in *Redevelopment Authority,* and its reasoning—that allowing coverage for breach-of-contract claims unfairly renders the insurer a party to the contract—remains valid and unaffected by *Vandenberg*'s rejection of *International Surplus. Phico* arrived at its conclusion independently of *International Surplus,* and *Redevelopment Authority* relies on *Phico* without any connection to *International Surplus* or any other non-Pennsylvania case. Thus, recognition of *Phico*—a case decided by the Pennsylvania Superior Court, whose reasoning we may not ignore under these circumstances—is a separate and independent reason to uphold the validity of *Redevelopment Authority.*

*Imperial Casualty,* the Third Circuit case purportedly in conflict with *Redevelopment Authority,* is distinguishable. In that case, while the court rejected USF & G's argument relating to the tort/contract distinction, neither party disputed the existence of an "occurrence" under the policy. *Imperial Casualty,* 858 F.2d at 134. In *Redevelopment Authority* and its progeny, the issue of what constitutes an "occurrence" was explicitly discussed and decided. Because the issue before this court is the existence of an "occurrence," we believe that the Pennsylvania courts' more well-developed law is properly applied.

Implementing the analysis dictated by *Redevelopment Authority,* we find that any potential claim by Rutland would have been solely for breach-of-contract. The main focus of the relationship between Keystone and Rutland was the sales agreement relating to the Mineral Black 123. The Mineral Black 123 was manufactured in a way that did not conform to Rutland's requirements for the manufacture of the plastisol; any negligence or product defect

was not the "gist" of Rutland's concerns. Indeed, Rutland's claims did not indicate that Keystone's conduct was tortious, accidental, or non-contractual in nature; Rutland alleged merely that the Mineral Black 123 was inadequate for the manufacture of plastisol. *See Snyder,* 715 A.2d at 487. Further, while Keystone may have manufactured a product that did not meet Rutland's expectations, Keystone was under no duty imposed by social policy to make the Mineral Black 123 a certain size. Rather, Keystone breached a duty imposed by mutual consensus with Rutland. *See id., Pro Dent,* 2001 WL 474413, at *2 (engaging in a similar analysis). Because Rutland's only remedy was for breach-of-contract or breach-of-warranty under the U.C.C., there was no "occurrence," and Keystone's claim is not covered under the AMI policy.

■ Keystone argues in the alternative, however, that AMI should be equitably estopped from denying coverage because it settled Keystone's "identical" 1997 claim relating to Shiraishi, but did not assert that claims such as that one were not covered under Keystone's substantially similar 1997 policy.

■ "The essential elements of estoppel are 'an inducement by the party sought to be estopped to the party who asserts the estoppel to believe certain facts exist—and the party asserting the estoppel *acts in reliance on that belief.'* " *Artkraft Strauss Sign Corp. v. Dimeling,* 429 Pa.Super. 65, 631 A.2d 1058, 1061 (1993) (quoting *Sabino v. Junio,* 441 Pa. 222, 272 A.2d 508, 510 (1971)). In order for an insurer to be estopped from denying coverage, the insured "must establish that 'he relied upon the company's actions to his detriment." *Nationwide Mutual Fire Ins. Co. v. Salkin,* 163 F.Supp.2d 512, 517 (E.D.Pa.2001) (quoting *Turner v. Federal Ins. Co.,* No. CIV. A. 94–3393, 1995 WL

33096, at * 2 (E.D.Pa.Jan.25, 1995)). The reliance by the party asserting estoppel must be justifiable. *McConnell v. Berkheimer,* 781 A.2d 206, 210 (Pa.Super.2001) (citing *Bahl v. Lambert Farms, Inc.,* 773 A.2d 1256, 1260 (Pa.Super.2001); *Curran v. Eberharter,* 361 Pa.Super. 65, 521 A.2d 474, 479–80 (1987)).

Keystone points to no evidence that it justifiably or detrimentally relied on AMI's payment of the 1997 claim. It merely argues that it reasonably expected the Rutland claim to be covered based on the coverage of the earlier claim. While this may or may not be true, without justifiable and detrimental reliance on the settlement of the prior claim, Keystone may not successfully assert equitable estoppel. *See Atlantic Mutual Insurance Co. v. Nicoletti Beer Distributors,* No. CIV.A. 94–3699, 1995 WL 639823, at *6 (E.D.Pa. October 30, 1995) (rejecting the insured's estoppel argument where there was no evidence of reliance on insurer's conduct).

Any reliance on the payment of the Shiraishi claim would not have been justifiable in any event. The policy states: "We may, at our discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result." (AMI 1998 Policy at § 1, ¶ 1(a).) The Shiraishi claim arose in Japan and was for significantly less money than was the instant claim; rather than conducting a costly investigation overseas, AMI exercised its discretion to settle the claim and dispense with any other expense. The instant claim, however, was local and for far more money than was the Shiraishi claim. Even though AMI did not provide Keystone with a coverage opinion on the Shiraishi claim, Keystone's reliance on the payment of the Shiraishi claim as proof of coverage for the instant claim would not have been reasonable, given the difference in character between the two claims. The District of Columbia Circuit

has noted that the payment of a single claim "should not, without more, bind [a comprehensive general liability] insurer to an interpretation under which the insured is covered for all similar claims." *Charter Oil Co. v. American Employers' Insurance Co.,* 69 F.3d 1160, 1168 (D.C.Cir.1995). The court reasoned that otherwise, before paying a modest claim, the insurer would be forced to "conduct an investigation in far greater depth than the amount at stake would justify, simply to avoid the risk of massive exposure down the road." *Id.* We agree with this reasoning and will not issue a holding that discourages insurance companies from engaging in sound cost-benefit practices.

Moreover, "the courts of most jurisdictions agree that [estoppel is] not available to broaden the coverage of a policy so as to protect the insured against risks not included therein or expressly excluded therefrom." 26 Am.Jur. Proof of Facts 2d 137 (1981); *see also* 14 Summ. Pa. Jur.2d Insurance § 10:4 (1994) ("The doctrines of waiver and estoppel do not apply where no contract exists, and they cannot create an insurance contract where none existed, nor can they create a liability for benefits not contracted for.") (footnotes omitted). As we discussed above, the AMI policy does not cover claims such as the one relating to Rutland's damages; thus, estoppel is not appropriate.

One point remains. Keystone points out that on a previous occasion, Rutland made a similar claim against Keystone, and Keystone's subsequent insurance claim was paid by Fireman's Fund Insurance Company, Keystone's insurer at the time. Keystone apparently argues that the payment of that claim made it reasonable to expect AMI to pay the instant Rutland claim. Keystone cites no law to support its position, and we find no merit to this argument.

## CONCLUSION:

Keystone's claim for damages to Rutland was based on a simple breach of a contract or warranty. Therefore, there was no "occurrence" under Keystone's AMI general liability insurance policy, and the policy does not provide for coverage. Further, AMI is not estopped from denying coverage; Keystone points to no evidence that it relied on AMI's previous conduct, and any reliance would not have been justifiable. Moreover, estoppel is not properly used to create liability for nonexistent benefits.

AMI's motion for summary judgment will be granted, and Keystone's motion for partial summary judgment will be denied. We predict that if the Pennsylvania Supreme Court were faced with the identical case, it would hold as we do. An appropriate order follows.