

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-14-2009

# Nationwide Mutl Ins v. CPB Intl Inc

Precedential or Non-Precedential: Precedential

Docket No. 07-4772

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Nationwide Mutl Ins v. CPB Intl Inc" (2009). *2009 Decisions.* Paper 1444.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1444

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 07-4772

NATIONWIDE MUTUAL INSURANCE COMPANY

v.

CPB INTERNATIONAL, INC.;
NBTY, INC.; REXALL SUNDOWN, INC.

CPB International, Inc.,
                                        Appellant

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(D.C. Civil No. 06-cv-00363)
District Judge:  Honorable A. Richard Caputo

Submitted Under Third Circuit LAR 34.1(a)
March 3, 2009

Before: BARRY, WEIS, and ROTH, <u>Circuit Judges</u>

(Opinion Filed: April 14, 2009)

Kathryn A. Dux, Esq.
German, Gallagher & Murtagh
200 South Broad Street
5th Floor
Philadelphia, PA 19102-0000

Charles E. Haddick, Jr., Esq.

Dickie, McCamey & Chilcote
1200 Camp Hill Bypass
Suite 205
Camp Hill, PA 17011-0000

<u>Counsel for Appellee</u>


Michael D. Collins, Esq.
P.O. Box 588
Shawnee Square, Buttermilk Fall Road
Shawnee-on-Delaware, PA 19356-0000

<u>Counsel for Appellant</u>

---

OPINION OF THE COURT

---

BARRY, <u>Circuit Judge</u>

CPB International ("CPB") appeals the District Court's grant of Nationwide Mutual Insurance Company's ("Nationwide") motion for summary judgment in this declaratory judgment action that Nationwide filed to determine its obligations under a commercial general liability ("CGL") policy it had issued to CPB (the "policy"). The central issue is whether the policy required Nationwide to defend and indemnify CPB against an action brought by Rexall Sundown, Inc. and a related corporation, NBTY, Inc. (collectively "Rexall"). The action alleged that CPB breached a contract for the delivery of goods by providing a defective product and sought consequential damages for that breach. The District Court held that because the underlying claim was "contractual in nature," it was not covered by the terms of the policy. We will affirm, predicting, as we do so, that the Supreme Court of Pennsylvania would hold that an action arising out of a contract between the parties is not covered by a CGL policy in Pennsylvania.

**I.**

CPB is an importer and wholesaler of chondroitin, a nutritional supplement made from animal cartilage. CPB imports chondroitin manufactured in China and sells it to companies in the United States which combine chondroitin and glucosamine, a nutritional supplement made from crab, lobster and shrimp shells, with other ingredients to manufacture nutritional tablets. The tablets are beneficial to people who suffer from osteoarthritis. Nationwide issued a CGL policy to CPB, which the parties agree was in effect at the time of the alleged breach. Under the policy, Nationwide agreed to "pay those sums that [CPB] be[came] legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies." (Appendix at 134.)

Although the present action is between Nationwide and CPB, the underlying dispute is between Rexall and CPB. Our focus is whether that dispute triggers Nationwide's duties under the policy.

## A. The Underlying State Court Litigation.

CPB has been a Rexall vendor since at least 1997, and agreed, as recently as June 11, 2003, to Rexall's vendor compliance regulations. Pursuant to that agreement, CPB promised to deliver products of the highest industry standards, and Rexall was entitled to reject imperfect goods and all goods not conforming to purchase order requirements.

On October 1, 2004, Rexall ordered 10,000 kilograms of chondroitin at seventy-six dollars per kilogram from CPB. On October 27, 2004, Rexall ordered an additional 10,000 kilograms of chondroitin at the same price. In December 2004, CPB filled the first order, and billed Rexall $760,000 by invoice. Rexall paid the invoice in January 2005. Thereafter, CPB partially filled Rexall's second order by sending it 9,500 kilograms of chondroitin, and billing it $722,000. Rexall did not pay for the second shipment.

In April 2005, CPB filed suit against Rexall for breach of contract and demanded payment for the second shipment. Rexall filed an answer and counterclaim (the "underlying claim"), alleging that the chondroitin that was shipped to it was deficient, of improper composition, and unusable for its intended purpose, and

that the delivery of the material constituted a material breach of contract. Rexall thus sought return of its initial $760,000 payment and consequential damages in an amount exceeding $1,195,465 for the shipment of the allegedly defective chondroitin. Rexall did not discover that the chondroitin was of improper composition until after it had already combined it with glucosamine and other ingredients to form the nutritional tablets. The tablets, which were mixed with ingredients valued at more than $991,015, are now allegedly useless and without value.

CPB tendered the underlying claim to Nationwide pursuant to the policy. Nationwide assumed defense of the action, but did so under a reservation of rights.

## B. The Policy.

Nationwide is bound to pay damages that CPB "becomes legally obligated to pay . . . because of . . . 'property damage' to which [the policy] applies." The policy applies "only if . . . 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory.'" (Appendix at 134.) Both "property damage" and "occurrence" are defined terms. Property damage means "[p]hysical injury to tangible property, including all resulting loss of use of that property . . . or [l]oss of use of tangible property that is not physically injured." (*Id.* at 147.) "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.* at 146.)

The policy also features express exclusions, including one that is particularly relevant here. Exclusion "b" is entitled "Contractual Liability," and states that the "insurance does not apply to . . . 'property damage' for which the insured is obligated pay damages by reason of the assumption of liability in a contract or agreement." (Appendix at 135.)[1]

---

[1] The contractual liability exclusion also has two carve outs:

This exclusion does not apply to liability for damages:
    (1) That the insured would have in the absence of the

– 4 –

**C. The Present Action**.

On February 16, 2006, Nationwide filed this action seeking a declaratory judgment that it owed no duty to defend or indemnify CPB against Rexall's claims. Nationwide asserted that the underlying claim did not allege an "occurrence" covered under the policy, and, alternatively, that the contractual liability exclusion barred coverage. CPB, in turn, filed a counterclaim on May 8, 2006, seeking a judgment declaring precisely the opposite – that Nationwide does owe CPB a duty to defend and indemnify it against the claims asserted by Rexall.

The parties filed cross-motions for summary judgment, and the District Court granted Nationwide's motion. It held that "[b]oth the allegation that CPB did not provide the material it was obligated to under the contract [with Rexall], and the allegation that such breach caused consequential damage to [Rexall's] property are claims based on duties CPB owed [Rexall] only by virtue of having entered into a contract with [it]. As such, the underlying claims are based in contract, and do not arise from covered 'occurrences.'" (Appendix at 18-19.) Alternatively, the Court held that the contractual liability exclusion applied to Rexall's claims.

## II.

"Our standard of review of a grant of summary judgment is plenary." *Gardner v. State Farm Fire & Cas. Co.*, 544 F.3d 553,

---

contract or agreement; or
(2) Assumed in a contract or agreement that is an 'insured contract,' provided the . . . 'property damage' occurs subsequent to the execution of the contract or agreement.

(Appendix at 135.) "Insured contract" is a defined term, and is not relevant here. (*See id.* at 145 (term includes a lease, sidetrack agreement, easement, license agreement, obligation to indemnify a municipality, and elevator maintenance agreement).)

557 (3d Cir. 2008).[2]

"Under Pennsylvania law, which the parties agree is applicable here, the 'interpretation of an insurance contract regarding the existence or non-existence of coverage is generally performed by the court.'" *Id.* at 558 (quoting *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 290 (Pa. 2007)); *see Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 897 (Pa. 2006) ("The interpretation of an insurance contract is a question of law that we will review *de novo*").

Our inquiry is straightforward. We look first to the terms of the policy which are a manifestation of the "intent of the parties." *Baumhammers*, 938 A.2d at 290. "When the language of the policy is clear and unambiguous, we must give effect to that language." *Id.* (quoting *Kvaerner*, 908 A.2d at 897). "However, 'when a provision in the policy is ambiguous, the policy is to be construed in favor of the insured . . . .'" *Id.* (quoting *Kvaerner*, 908 A.2d at 897). Next, we compare the terms of the policy to the allegations in the underlying claim. "It is well established that an insurer's duties under an insurance policy are triggered by the language of the complaint against the insured." *Kvaerner*, 908 A.2d at 896.[3] "In determining the existence of a duty to defend, the factual allegations of the underlying complaint against the insured

---

[2] The District Court exercised diversity jurisdiction under 28 U.S.C. § 1332, and we have jurisdiction over the final order of the District Court pursuant to 28 U.S.C. § 1291.

[3] Although this action involves both the duty to defend and the duty to indemnify, we are concerned primarily with the former which is broader than the latter. *Kvaerner*, 908 A.2d at 896 n. 7; *see General Accident Ins. Co. of America v. Allen*, 692 A.2d 1089, 1095 (Pa. 1997) ("duty to defend is separate from and broader than the duty to indemnify, [though] both duties flow from a determination that the complaint triggers coverage"). A finding that the duty to defend is not present will preclude a duty to indemnify. *Kvaerner*, 908 A.2d at 896 n. 7. "Thus, if [Nationwide] does not have a duty to defend [CPB] in this suit, neither does it have the duty to indemnify." *Id.*

are to be taken as true and liberally construed in favor of the insured." *Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.*, 193 F.3d 742, 746 (3d Cir. 1999).

Thus, we look to the language of the policy "to determine in which instances [it] will provide coverage, and then examine [Rexall's counterclaim] to determine whether the allegations set forth therein constitute the type of instances that will trigger coverage." *Kvaerner*, 908 A.2d at 897. If we conclude that a "single claim in a multi-claim lawsuit is potentially covered, the insurer must defend all claims until there is no possibility that the underlying plaintiff could recover on a covered claim." *Frog*, 193 F.3d at 746. Because it is clear that the underlying complaint alleges property damage as that term is used in the policy, this appeal turns on whether the alleged breach is an occurrence.

## A. Claims Based on Faulty Workmanship.

In *Kvaerner*, the Supreme Court of Pennsylvania interpreted policy language identical to that at issue here. *See* 908 A.2d at 897 (policy defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same or general harmful conditions"). The court noted that the "key term in the ordinary definition of 'accident' is 'unexpected.'" *Id.* at 898. There, the underlying claim, filed by Bethlehem Steel Corporation, alleged that the insured failed to construct a coke oven battery that met the agreed-upon contract specifications. *Id.* at 891. Bethelehem sought damages for breach of contract and breach of warranty. *Id.* The court characterized the claim as one for "faulty workmanship," and held that "the definition of 'accident' required to establish an 'occurrence' under the polic[y] cannot be satisfied by claims based upon faulty workmanship." *Id.* at 899. Perhaps recognizing the *Kvaerner* court's logic, CPB concedes that Rexall's claim that it provided defective chondroitin, without more, would not trigger coverage. *See* Appellant's Br. at 12, 24. CPB is correct – Rexall's claim that CPB delivered chondroitin of defective quality is an allegation of faulty workmanship that is not covered by the policy, although the workmanship involved here is a failure to perform quality control as to the product to be delivered rather than a failure to build a coke oven to the proper specifications. *See Kvaerner*, 908 A.2d at 899.

CPB argues, however, that because Rexall's action alleges consequential damages, it comes within the ambit of the policy. That argument is unpersuasive. The precise holding of *Kvaerner* is limited to claims that "aver[] only property damage from poor workmanship to the work product itself," 908 A.2d at 900, but the foundation of that holding is that claims for faulty workmanship "simply do not present the degree of fortuity contemplated by the ordinary definition of 'accident' or its common judicial construction in this context." *Id.* at 899. In other words, it is largely within the insured's control whether it supplies the agreed-upon product, and the fact that contractual liability flows from the failure to provide that product is too foreseeable to be considered an accident. *See id.* Here, although the delivery of defective chondroitin is not considered an accident, *see id.*, CPB argues that Rexall's use of that product should be considered one. That distinction is inapposite. It is certainly foreseeable that the product CPB sold would be used for the purpose for which it was sold. Otherwise, Rexall would lack a claim for consequential damages. *See Ferrer v. Trustees of Univ. of Pennsylvania*, 825 A.2d 591, 610 (Pa. 2002) (To prove consequential damages from breach of contract, plaintiff must establish that "(1) they were such as would naturally and ordinarily result from the breach, or (2) they were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and (3) they can be proved with reasonable certainty").[4] Thus, "the degree of fortuity" here is no

---

[4] Pennsylvania adheres to the Uniform Commercial Code. *See* 13 Pa.C.S.A. § 1101, et seq., which likely applies to the transaction that gave rise to the underlying claim. *See id.* at §§ 2102, 2104. The U.C.C. has similar requirements for consequential damages.

Consequential damages resulting from the breach of the seller include:

> (1) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

different than that involved in *Kvaerner*, 908 A.2d at 898.

The Superior Court of Pennsylvania, when confronted with an argument similar to the one that CPB makes here, reached the same conclusion. *See Millers Capital Ins. Co. v. Gambone Bros. Dev. Co.*, 941 A.2d 706 (Pa. Super. Ct. 2008); *see also Nationwide Mut. Ins. Co. v. Buffetta*, 230 F.3d 634, 637 (3d Cir. 2000) ("opinions of intermediate appellate state courts are not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise" (quotations and citations omitted)). In *Millers Capital*, the insured was a housing developer, and the plaintiffs in the underlying action alleged that faulty construction resulted in severe leaking which damaged the interior of their homes. 941 A.2d at 713. The insured conceded that "*Kvaerner* stands for the broad principle that an insurance claim under an occurrence based GCL policy that defines the 'occurrence' as an accident cannot be premised on a claim of faulty workmanship," *id.* at 713, but contended that the underlying action "involve[d] claims for ancillary and accidental damages caused by the resulting water leaks to . . . the home interiors," and that those claims alleged "an 'occurrence' even though the damage to the" home exterior did not. *Id.* The Superior Court did "not see any merit in the distinction [the insured] attempt[ed] to create." *Id.* Instead, the Superior Court interpreted the *Kvaerner* decision as stating that "natural and foreseeable acts . . . which tend to exacerbate the damage, effect, or consequences caused *ab initio* by faulty workmanship also cannot be considered sufficiently fortuitous to constitute an 'occurrence' or 'accident' for the purposes of an occurrence based CGL policy." *Id.* That reasoning applies equally here.

---

> (2) injury to person or property proximately resulting from any breach of warranty.

13 Pa. C.S.A. § 2715(b); *see id.* at § 2313(a)(2) ("Express warranties by the seller are created as follows . . . [a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description").

## B. Breach of Contract is Not an Occurrence.

In any event, "Pennsylvania law does not recognize the applicability of a general liability policy to breach of contract and breach of warranty claims." *Pennsylvania Mfrs.' Ass'n Ins. Co. v. L.B. Smith, Inc.*, 831 A.2d 1178, 1181 (Pa. Super. Ct. 2003); *see Freestone v. New England Log Homes, Inc.*, 819 A.2d 550, 553 (Pa. Super. Ct. 2003); *Snyder Heating Co. v. Pennsylvania Mfrs.' Assoc. Ins. Co.*, 715 A.2d 483, 487 (Pa. Super. Ct. 1998). "The purpose and intent of a general liability insurance policy is to protect the insured from essentially accidental injury to the person or property of another rather than coverage for disputes between parties to a contractual undertaking." *L.B. Smith*, 831 A.2d at 1181.

CPB argues that because the Supreme Court of Pennsylvania has not specifically held that actions for breach of contract are not covered by CGL policies in Pennsylvania, the issue remains open and coverage should not be denied on that basis. "In predicting how the highest court of the state would resolve the issue, we must consider 'relevant state precedents, analogous decisions, considered dicta, [and] scholarly works . . . .'" *Buffetta*, 230 F.3d at 637 (quoting *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 663 (3d Cir. 1980)).

Sitting *en banc* in *Redevelopment Authority of Cambria County v. International Insurance Company*, 685 A.2d 581 (Pa. Super. Ct. 1996), the Superior Court of Pennsylvania held that a CGL policy "do[es] not provide coverage for claims in [an] underlying action [that] arise out of and relate to the contract between the parties." *Id.* at 592. That language has since become a well-established principle of insurance interpretation in Pennsylvania. *See L.B. Smith*, 831 A.2d at 1181.

Although the *Kvaerner* decision did not expressly adopt the *Redevelopment Authority* holding, it did offer several indications that, if presented with the question of whether breach of contract claims are covered by a CGL policy, the Supreme Court of Pennsylvania would reach the same conclusion. First, *Kvaerner* cites *Snyder Heating* and approvingly describes the decision as follows: "The [*Snyder Heating*] court held that there was no

-10-

coverage under the language of the CGL policy because the complaint set forth solely claims for breach of contract." 908 A.2d at 898. Second, *Kvaerner* states that "[t]he application and limitations of CGL policies were aptly explained in a seminal law review article," and then quotes the article which states, in relevant part, that: CGL "coverage is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained." *Id.* (quoting Roger C. Henderson, [*Insurance Protection for Products Liability and Completed Operations; What Every Lawyer Should Know*], 50 Neb. L. Rev. 415, 441 (1971)); *see* 9A Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 129:16 (2008) (using same language). Finally, the Court expressed reluctance to convert a CGL "policy for insurance into a performance bond," *Kvaerner*, 908 A.2d at 899, which echoes the Superior Court's reticence to "convert a [CGL] policy into a professional liability policy or a performance bond" by recognizing coverage for breach of contract. *Redevelopment Authority*, 685 A.2d at 592.

We are, therefore, confident that the Supreme Court of Pennsylvania would conclude that an underlying claim alleging breach of contract would not trigger coverage under a CGL policy. *See Snyder Heating*, 715 A.2d at 487. The District Court properly concluded that Rexall's allegations against CPB "are based in contract and do not arise from covered 'occurrences.'" (Appendix at 19.) *See Snyder Heating*, 715 A.2d at 487 (citing *Phico Ins. Co. v. Presbyterian Med. Servs. Group*, 663 A.3d 753, 757 (Pa. Super. 1995) ("important difference between contract and tort actions is that the latter lie from a breach of duties imposed by law as a matter of social policy while the former lie from the breach of the duties imposed by mutual consensus agreements between particular individuals").[5]

---

[5] In *Keystone Filler & Mfg. Co., Inc. v. American Mining Ins. Co.*, 179 F. Supp. 2d 432 (M.D. Pa.), *aff'd mem.* 55 Fed Appx. 600 (3d Cir. 2002), a district court applying Pennsylvania law to very similar facts reached the same conclusion in a persuasive decision. There, the insured made a carbon-based product from finely-ground coal, and sold it to a company that used the product

-11-

## C. *Contractual Liability Exclusion*.

Finally, even if the underlying claim alleged an occurrence covered by the policy, it fits within the contractual liability exclusion. That exclusion states that the "insurance does not apply to . . . 'property damage' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement." (Appendix at 135). The *Snyder Heating* court interpreted the same contract language, 715 A.2d at 485, and concluded that "the CGL policy clearly excludes from coverage breaches of contract; the policy language provides that the insurance contract will not apply to [the insured's] failure to perform a contract or agreement in accordance with its terms." 715 A.2d at 487.

## III.

For the foregoing reasons, we will affirm the District Court's grant of summary judgment in favor of Nationwide.

---

as a component of plastisol (a material used in automobile filters). 179 F. Supp. 2d at 436. The insured's product contained oversized particles and damaged a certain amount of plastisol, rendering it useless. *Id.*

The court noted that the "rule . . . that there is no 'occurrence' if the underlying claim is one merely for breach-of-contract[] has been followed by numerous state and federal courts sitting in Pennsylvania." *Id.* at 440; *see id.* (cataloguing cases). It went on to state that the insured's product "was manufactured in a way that did not conform to [the purchaser's] requirements for the manufacture of plastisol" and that the underlying claim stemmed from a "breach[] [of] duty imposed by mutual consensus with" the purchaser. *Id.* at 442-43. Therefore, it did not trigger coverage. *Id.*